FILED
**United States Court of Appeals**
**Tenth Circuit**

**April 10, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

RAYMOND ALCORTA,

     Defendant - Appellant.

No. 15-3129

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 5:13-CR-40065-DDC-3)**
_____

Jonathan Laurans, Kansas City, Missouri, for Defendant-Appellant.

James A. Brown, Office of the United States Attorney, Topeka, Kansas, for Plaintiff-Appellee.

_____

Before **KELLY**, **HARTZ**, and **MATHESON**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

Defendant Raymond Alcorta was charged with conspiracy to traffic methamphetamine with Javier Vega, Karmin Salazar, Adrienne Lopez, and Angela Lopez, who acted as drug couriers. They all lived in California; the drugs were delivered to Kansas City. Vega and Salazar pleaded guilty, while Defendant, Adrienne, and

Angela proceeded to a joint trial in the United States District Court for the District of Kansas. All three were found guilty of conspiracy to distribute more than 500 grams of methamphetamine, and the couriers were also convicted of possessing methamphetamine with intent to distribute. We have reversed the convictions of Adrienne and Angela because the search of their vehicle violated the Fourth Amendment. *See United States v. Lopez*, 849 F.3d 921, 929 (10th Cir. 2017). But because Defendant has no standing to complain of that search and has not done so, we can consider on this appeal the evidence obtained in that search.

Defendant appeals, challenging the sufficiency of the evidence and the admission of recorded jailhouse conversations of coconspirators. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. Defendant's conviction was supported by sufficient evidence, and his arguments challenging the admission of the conversations are unpersuasive.

## I.     SUFFICIENCY OF THE EVIDENCE

### A.  Standard of Review

We examine the record de novo to determine whether the evidence, viewed in the light most favorable to the government, could convince a reasonable jury that the defendant was guilty beyond a reasonable doubt. *See United States v. Scull*, 321 F.3d 1270, 1282 (10th Cir. 2003). Because successful conspiracies are secret affairs, guilt must often be established by circumstantial evidence. *See United States v. Dazey*, 403 F.3d 1147, 1159 (10th Cir. 2005).

## B. The Evidence

The evidence against Defendant consisted mostly of recorded jailhouse conversations and physical evidence (including cell phones) gathered from the vehicles of the arrested couriers. Kansas state police officer Scott Proffitt, who served on a task force with agents of the federal Drug Enforcement Administration (DEA), testified about his investigation into this conspiracy, including his interpretation of the coded language used by the conspirators in their recorded conversations, his linking of the conversations to physical evidence, and his synthesis of this evidence. None of the conspirators testified.

The government presented evidence of three drug-trafficking trips by the couriers. Vega and Salazar were arrested during the first trip after a traffic stop in Kansas. Adrienne and Angela then successfully executed a trip before also getting arrested after a Kansas traffic stop on a later try. Each arrest yielded about four pounds of methamphetamine.

After the couriers were arrested and taken to jail, they used jailhouse phones to make calls that were recorded by jail officials. Before listening to the recordings, the police were unaware that the two arrests were related. But with the aid of the conversations, they pieced together the conspiracy and concluded that Defendant was at its helm.

### 1. The Three Trips

On April 27, 2013, Vega and Salazar were arrested while driving a Jeep Cherokee on Interstate Highway 70 near Russell, Kansas. They had fallen for a ruse devised by

3

Kansas law enforcement. A sign on the highway falsely announced a drug-check lane ahead and another announced a drug dog in use. After Vega and Salazar passed the signs they took the next exit and were promptly pulled over for not stopping properly at a stop sign and nearly hitting another vehicle. Vega granted consent to search the vehicle, where four pounds of methamphetamine was hidden in a false battery. Officers also found five cell phones and various documents.

The Lopezes were arrested on U.S. Route 54 two months later, on June 21. After they were stopped for speeding near Liberal, Kansas, a search of their vehicle revealed about four pounds of methamphetamine. Four cell phones and various documents were also seized from their car. A rental receipt showed that the car had been rented near Los Angeles on June 20.

The government also presented evidence (discussed below) that the Lopezes drove drugs from California to Kansas City on June 11. After making the delivery, the Lopezes flew back to Los Angeles with cash.

### 2. Connecting the Deliveries

The link between the two arrests was discovered by Officer Proffitt. Soon after the arrest of Vega and Salazar, Proffitt spoke with them in jail, seeking cooperation for a controlled delivery. Failing at that, he subpoenaed records of their phone calls, visitors, and commissary accounts while they were in jail.

The subpoenas yielded over 100 hours of recorded phone calls. Because of the delay between subpoenaing the calls and receiving the recordings, Proffitt listened to the calls more than a month after they occurred. He discovered that Vega had been

4

communicating with Adrienne before she was arrested. In a call between Vega and his niece Michelle Holguin[1] on June 8, three days before Adrienne's successful drug-delivery trip to Kansas City, Holguin told Vega that a woman he barely knew named Grumpy (Adrienne's nickname) had a crush on him and wanted to get to know him by writing to him in jail and talking on the phone. Vega was receptive to talking with her. The next day Adrienne called him and said that she would visit him at the Kansas jail. She told him that she would be headed to the area to "visit [her] sister" that week and hoped to see him then. Ex. 6 (Conversation 6-13).

When Adrienne and Vega talked again on June 11, she said that she was "like an hour" away from Kansas City. Ex. 6 (Conversation 6-16). Vega coached her to avoid ruse drug checkpoints (the police tactic that had landed him in jail), telling her, "[I]f you see anything on the freeway no matter what it says do not get off keep going." *Id.* From later calls, Proffitt learned that Adrienne did not visit Vega on that trip but was already planning another trip to Kansas soon and would visit him.

On June 14, Adrienne told Vega that she would be "over there I think this week or next weekend." Ex. 6 (Conversation 6-20). Upon hearing this, Vega reminded Adrienne of his warning about signs, saying, "Listen really carefully to what I'm telling you, okay? . . . Whenever you're driving on 605 . . . . and you see any signs—no matter what it says, no matter what it says do not get off." *Id.* She replied, "I know! You already told me,"

---

[1] Holguin is the daughter of Defendant's former girlfriend (and Javier Vega's sister), Veronica Vega. Although the government indicted Holguin for conspiracy and brought her to trial with Defendant, Adrienne, and Angela, it dismissed the charges against her during trial. Nonetheless, the government continued to assert that Holguin was a coconspirator for evidentiary purposes.

and then said, "[D]on't tell me nothing about none of that bullshit on the phone but I'll talk to you when I see you." *Id.*

On June 20, Adrienne told Vega that she and her friend Angela were planning to leave California that day, drive for 20 hours straight, and arrive in Kansas City the next day. After learning from later recordings that Adrienne and Angela had been arrested during this trip, Proffitt determined which DEA agent was investigating them, and the two investigations were merged.

### 3. Finding the Source

The investigation showed the connection of Defendant Raymond Alcorta to the conspiracy. We examine that evidence in retrospect, not as Proffitt discovered it.

The car used by Vega and Salazar on April 27 was owned by Vega's sister, Veronica, who had been Defendant's girlfriend. Defendant's name appeared on several documents found in the car. The proof of insurance listed two insured drivers, Defendant and Veronica. There were papers relating to Defendant's boxing business. And perhaps most significantly, there were receipts from auto-repair shops with Defendant's name as the customer. (The drugs were concealed in a fake battery, and Proffitt testified that this alteration to the car would have required "some degree of time and effort to effect." Aplt. App. Vol. VII at 1534.)

Proffitt examined the five phones found in the car. He explained to the jury the importance of cell phones to a drug conspiracy:

> The criminal enterprise of distributing drugs is just like the rest of us. There has to be contact made. Usually at a distribution level it's not a real close proximity, it's a long distance. So these people probably aren't

6

driving over to the house and saying hello and discussing these things. It's through phone calls and/or text messages. So in my job I would say one of my prime pieces of evidence is usually the cell phones that they're taking with them or have with them.

*Id.* Vol. IV at 920.

Salazar claimed ownership of two of the phones, Vega claimed two, and neither claimed the fifth. The contact list on one of Salazar's phones included the name "Ray" with a phone number in area code 562. That this "Ray" was Defendant was confirmed by evidence found in the car. Defendant's full name and that number were listed on two of the invoices from auto-repair centers, on a Western Union money-transfer receipt, and on a handwritten note.

Several calls had been made on March 23 and 24 from Salazar's phone to Defendant's phone. And on March 28, Salazar sent Defendant the following text: "Hello. I've been in bed for the past two days. Haven't done anything. But as soon as I do I'll let you know. You know where I am and don't think that I'm avoiding you." *Id.* Vol. V at 984–85, Vol. VII at 1705–06. Defendant responded, "Okay." *Id.* Vol. V at 985, Vol. VII at 1706.

On the unclaimed phone found in the car there were text messages on April 22 (five days before the arrests) between a person who identified himself as "javi"—a name frequently used by Javier Vega in the recorded prison conversations—and Defendant's 562 number:

> Defendant: You almost here??
> Vega: Where u @?
> Vega: Its me javi where u @?
> Defendant: Ok

7

> Defendant: Call me
> Defendant: ????
> Defendant: I need to know if you're going
> Defendant: ???

Aplee. App. at 15–25; Aplt. App. Vol. V at 1003–07.

The two phones in the car claimed by Vega had nothing stored on them. In a recorded jailhouse conversation with Defendant on June 22, Vega provided an explanation:

> Vega: Listen, what I did when I was leaving, right—
> Defendant: Uh huh.
> Vega: And before I left, when everything was all ready, I mean, I had factory reset my phone.
> Defendant: Uh huh.
> Vega: You know what I'm saying?
> Defendant: Yeah.

Ex. 6 (Conversation 6-41). Proffitt testified that a factory reset deletes all the information stored on a phone.

Additional recorded jailhouse conversations further indicated Defendant's involvement in Vega's foiled drug delivery. In one, Vega appears to be blaming Salazar for his decision to exit the highway after the ruse drug checkpoint, and he laments that Defendant did not send Adrienne on the trip instead of Salazar:

> Vega: Why didn't Ray ever tell me to take, to bring you to Kansas?
> Adrienne: I don't know.
> Vega: This would have never happened, let me tell you.
> Adrienne: I know, it wouldn't never have happened.
> Vega: Man, you don't even know, man. I got off the freeway because they told me to, you know what I'm saying.
> Adrienne: Yeah.
> Vega: I was going, I was going to keep going straight, and she was like, no, get off, get off, get off.

8

Ex. 6 (Conversation 6-34) (expletives deleted).  Sending Salazar was apparently not the first time that Defendant selected a courier to accompany Vega.  In other conversations Vega complained about another companion courier selected by Defendant, who foolishly attracted police attention by throwing napkins out the window while on the road.  *See* Ex. 6 (Conversation 6-24) ("Ray tells me oh yeah you should take that person, that person you know she, she fits the profile . . . [We] were like in San Bernardino . . . and she grabs a handful of napkins and she throws them out on the freeway."); Ex. 6 (Conversation 6-38) ("did I tell you about . . . the girl Ray met and then told me . . . she meets the, she fits the, she's perfect?  And she . . . threw a big ol' wad of paper . . . on the freeway.").

Despite his incarceration, Vega maintained ties with his coconspirators.  The list of persons authorized to visit him in jail comprised four people:  Defendant, Adrienne, Holguin, and Veronica Vega.  The recorded conversations indicated that Vega expected Defendant to provide him with financial assistance while in jail.  One of Vega's early calls after his arrest was to his niece, Holguin.  He asked her, "Have you talked to Ray?" Ex. 6 (Conversation  6-1).  When she said yes, Vega said, "Honey, tell him I don't have any money.  Nothing, nothing of money." *Id.*  A little later, Vega asked again, "What is Ray going to do?  He isn't going to do anything to help us?" *Id.*  In his next call Vega said, "And make sure that Ray . . . Ray don't forget about me or Karmin [Salazar] either, please." Ex. 6 (Conversation 6-2).

On May 10, in a conference call set up by Holguin, Vega reported to Salazar that "Ray sent us money."  Ex. 6 (Conversation 6-5).  On June 8, Holguin told Vega that

9

Defendant had given her $100 to put on Salazar's account. Vega's commissary account reflected a $100 deposit from Holguin in early July, a $45 deposit from her on July 29, another deposit from her on September 3, and a final deposit from someone using the name David Holguin on September 11. (There was no testimony about deposits before June or the amounts of the last two deposits.) Similarly, Salazar's account reflected a $100 deposit from Adrienne in June, a $100 deposit from Michelle Holguin in early July, a $45 deposit from her in late July, a $30 deposit from Leticia Vega in August, a $44 deposit from Michelle Holguin in September, a deposit from David Holguin in September, two deposits totaling $85 from Michelle Holguin in October, and an $80 deposit from Defendant in November. It appears that Vega was particularly concerned that Salazar receive money as encouragement for her to stick to her initial story to police that she was responsible for the drugs found in the car. *See* Ex. 6 (Conversation 6-4) (Salazar: "I told [the police officer] everything was mine."). In a June 14 conversation he seems to be telling Defendant that he has a good chance of avoiding jail time if Salazar does not feel that she is being hung out to dry. *See* Ex. 6 (Conversation 6-19) ("I got a really good chance at going home, if, I mean, if she, if Kandie keeps, if Kandie starts feeling like I'm hanging her out to dry . . . it's like I'm gonna have no action, you know?" (expletives deleted)). Defendant responded, "I know what you're saying, you don't have to tell me. They put money on both you guys already." *Id.*

In turn, Vega sought to help Defendant's enterprise from jail. On May 4 he told Holguin to tell "Ray" "to get rid of his phone." Ex. 6 (Conversation 6-1). On May 13 he told Defendant to get Vega's "contacts." Ex. 6 (Conversation 6-6). A few days later he

10

told Holguin that the contacts in his phone were "the people that [he] was dealing with" and "the people that [he] was making money from." Ex. 6 (Conversation 6-7). On July 1, Vega followed up with Defendant about getting those contacts, and Defendant replied that he had not yet done so. *See* Ex. 6 (Conversation 6-51).

With Vega and Salazar in jail, the conspirators had to take care not to disclose incriminating information in their communications. A good indication that the jailhouse conversations involved illicit activity was the conspirators' practice of cutting each other off from saying too much and using ambiguous or coded language to discuss their business. A few examples illustrate the practice: When Vega repeated his warning about deceptive highway signs, Adrienne told him not to talk about that "bullshit on the phone," saying she would "talk to you when I see you." Ex. 6 (Conversation 6-20). When Vega told Defendant, "you have to get my contacts so we can . . . ," Defendant cut him off, saying "Hey . . . I know, I know what you're saying." Ex. 6 (Conversation 6-6). And Vega was chastised by Salazar for calling Defendant by name:

> Vega: Hey, Ray sent us money the other day. Okay?
> Salazar: Okay. Don't say names.

Ex. 6 (Conversation 6-5). Proffitt described the practice among the coconspirators as follows: "If somebody starts to say too much, and not necessarily just names, the other person on the other end may try to shut them down or remind them that they are saying too much on the phone." Aplt. App. Vol. V at 1080. Proffitt also noted that the conspirators used the word "friend" to refer to "people when they try not to say names." *Id.* Vol. VII at 1641–42. Particularly with respect to Defendant, Proffitt observed:

11

Just listening to Ray Alcorta's calls I feel like without the other calls I would have come to the same conclusion of what the organization was doing through the items that he said, that were said to him, instructions he was giving, things that he would even be telling Javier [Vega] to not say or shutting him down on occasion. When Javi is getting ready to obviously say something that would be good for me and Ray is telling him to stop, to me, that means Ray Alcorta knew what Javi was going to say and it shouldn't be said where I could hear it.

*Id.* Vol. VII at 1726.

The recorded conversations also linked Defendant to the two drug trips by Adrienne and Angela. Defendant was the initial reference point for the link between Vega and Adrienne: Talking to Vega in jail, Holguin introduced Adrienne to him as the "girl that Ray knows with a tattoo on her face named Grumpy." Ex. 6 (Conversation 6-11). On June 11, Vega asked Defendant if he thought Grumpy was responsible to "do it," and Defendant responded that she was. Ex. 6 (Conversation 6-15). Although Defendant and Vega did not say what "it" was, the conversation was while Adrienne was driving to Kansas City. The government presented strong evidence that the purpose of the drive was to deliver drugs. First, in a conversation on June 11, Vega instructed Adrienne not to leave the highway, no matter what a highway sign may say—a warning that suggests her vehicle contained contraband. Second, less than two weeks later, Adrienne and Angela were caught with drugs going to Kansas City. Third, on Adrienne's phone, seized after her arrest, were photographs dated June 13 showing Angela and Adrienne on an airplane displaying wads of cash, and Angela's phone seized at the same time contained similar photographs. Proffitt testified that the photos were meant "to

12

show how much money they're making from delivering their dope." Aplt. App. Vol. VII at 1697.

The government showed that Defendant was in Kansas City at the same time as Adrienne and Angela. Airline records showed that he purchased a same-day ticket from Los Angeles to Kansas City for June 11, with a return trip the next day. The jailhouse conversations suggested that the timing of the two trips was not a coincidence. On June 13, Vega asked Adrienne if Defendant's trip was successful. Adrienne's answer showed that she was well aware of Defendant's trip:

> Vega: Where is Ray at?
> Adrienne: Home.
> Vega: He's already home?
> Adrienne: Home, yeah he is home sweet home.
> Vega: Everything is cool?
> Adrienne: Everything is cool.

Ex. 6 (Conversation 6-17). The next day, Vega confirmed directly with Defendant that he had returned home. He then asked Defendant if Adrienne had also returned. Not only did Defendant know that Adrienne had returned from her trip, but he also knew that she had gone on the trip with a companion:

> Vega: She at home already?
> Defendant: Yeah *they're* at home right now.
> Vega: Grumpy's already home?
> Defendant: Huh?
> Vega: Grumpy's already home?
> Defendant: Yeah. Yeah.

*Id.* (emphasis added). Later that day, Vega asked Adrienne if Defendant shared her return flight home, a question that made sense if their trips were coordinated:

> Vega: How long did it take you to get home?

13

> Adrienne:  How long?  Oh, we flew.
> Vega:  You flew back?
> Adrienne:  Yeah.
> Vega:  Who, you and Ray?
> Adrienne:  No, just me.

Ex. 6 (Conversation 6-20).

Defendant's daughter testified in his defense that he sometimes traveled to Kansas City to scout venues for his boxing business.  But there was no evidence that he did so on this trip.

There was also convincing evidence that Defendant was involved in the unsuccessful trip of Adrienne and Angela.  At 9 a.m. on June 20—the day the two couriers left on their drive to Kansas—Adrienne told Vega that Defendant had been calling her:

> Vega:  Where's Ray at?
> Adrienne:  I don't know.  He, they were calling me and calling me, but I was knocked out, and then when I woke up at the night time, in the middle of the night, I looked and I had a missed call from them.
> Vega:  From Ray or from Michelle?
> Adrienne:  From both. So now I gotta get up and get with it because I need to get over there.
> Vega:  What time are you going to take off?
> Adrienne:  I want to take off as soon as possible.
> Vega:  Be careful.

Ex. 6 (Conversation 6-36).

Soon thereafter, Adrienne told Vega that she was struggling to find a car for the trip.  Vega had the following advice:

> Vega:  Adrienne tell them to help you get a car, he will do it.
> Adrienne:  No, no, no I don't want to ask.
> Vega:  Look it, you need to start taking advantage of it, he's not a, you know what I'm saying?

14

> Adrienne:  I know but still I don't like people doing things for me, because I don't want to feel like I owe him.
> Vega:  But look, it's not like he's, he's not doing it for you, because you're part of the team.
> Adrienne:  No, I'm not part of the team.
> Vega:  How are, no I'm not talking about that team, I'm talking about, you're part of the team like we're, everybody is networking together so he's got to help you.  When I wanted to buy a car he helped me buy it.

Ex. 6 (Conversation 6-36) (expletives deleted).  Vega did not state who "he" was in this exchange, but the two discussed the same topic in a conversation two-and-a-half hours later.  Vega asked Adrienne how much money "he" had given her for gas, and explained that on his prior trips, the gas money he received was rarely sufficient.  Ex. 6 (Conversation 6-37).  Two or three minutes later, Vega was less cautious with names and said that when he needed to pay $1,700 to get his license, "Ray" offered to pay half.  *Id.* That evening, Vega again asked Adrienne about receiving money for the trip, and she confirmed that she had received it.

Further, Adrienne's phone records showed that on June 21, the day of her arrest, Defendant called her 25 times from two different numbers, twice before her arrest and 23 times afterwards.  The calls were from Defendant's 562-area-code number and from a 913-area-code number that appeared on the jail call log when Defendant called Vega.  The night of June 21, Defendant told Vega that he had been calling "what's her name" at her two numbers, but could not reach her because one phone was turned off and she did not answer on the other one.  *See* Ex. 6 (Conversation 6-40).  When Proffitt examined the contact list on Adrienne's cellphone, he found that it contained Defendant's 562 number but under the fake name "Dan."

15

The next day, Defendant told Vega that he had learned from Adrienne's cousin that she had been pulled over on her trip and was in jail. Although Adrienne's name was not used, Defendant asked Vega who "she" was with, and Vega replied "Angela Lopez." Ex. 6 (Conversation 6-41). The two men then had the following exchange:

> Vega: I was telling her, you know, I was trying to tell her how to come.
> Defendant: Mhm.
> Vega: And she was telling me like, ahh no, no, don't worry about it. And I'm saying like, I'm telling you, I already know, I already know the mistakes that people have done you know.
> Defendant: Yeah, but there's no reason for her to make mistakes because she's just driving up there you know, she goes the speed limit you know.

Ex. 6 (Conversation 6-41). Defendant then went on to provide a cover story for the conversation: "I know that she was trying to get there for a visit but [unintelligible] that's why I was worried or her family was worried too that." *Id.*

Officer Proffitt testified that Defendant later travelled to Kansas to bond Adrienne out of jail and bring her home to California. Two conversations supported his conclusion. On June 22, the day after Adrienne's arrest, Defendant asked Vega what his bail was when he was arrested. Then on June 28 he told Vega: "[T]his girl got released at 6 a.m. and I said, you know what, I'm gonna pack my, I drove over 3,000 miles in three, two and a half days, me and my niece . . . ." Ex. 6 (Conversation 6-45) (expletives deleted).

### C. Defendant's Conspiracy Conviction

The elements of the offense of conspiracy are (1) an agreement with another person to violate the law; (2) knowledge of the essential objectives of the conspiracy; (3) knowing and voluntary involvement; and (4) interdependence among the alleged

16

conspirators. *See United States v. Cornelius*, 696 F.3d 1307, 1317 (10th Cir. 2012). The government introduced sufficient evidence from which a jury could reasonably find these elements beyond a reasonable doubt.

Evidence tying Defendant to the failed first delivery included the documents bearing his name found in the car; a text from Salazar to Defendant one month before she was arrested indicating that she would soon be ready to work for him; Defendant's text to Vega a few days before Vega was arrested stating, "I need to know if you're going"; Vega's lament to Adrienne that Defendant sent Salazar on the trip instead of Adrienne; Vega's complaints that Defendant sent him on trips with a foolish companion who threw napkins out the window; Vega's statement to Defendant that he erased all the data on his two phones before he was arrested and his advice to Defendant to get rid of his phone; Vega's statement to Defendant that he should take Vega's contacts, which were the people that he was "dealing with" and "making money from"; Vega's expectation that Defendant would provide money to him and Salazar while they were in jail, and Defendant's fulfillment of that expectation; and Defendant's vagueness and circumspection when speaking with Vega on the jailhouse phone.

Evidence tying Defendant to the successful second delivery included his conversation with Vega stating that Adrienne was responsible to do "it" just as she was driving to Kansas City to deliver drugs; his turnaround flight to Kansas City at the same time that Adrienne and Angela were there; his statement to Vega that Adrienne came back safely from the trip; and Adrienne's report back to Vega that Defendant was "home sweet home" and that "everything is cool."

17

Evidence tying Defendant to the failed third delivery included Adrienne's statement to Vega on the day before her arrest that she missed a call from Defendant; Vega's questions about whether Defendant provided gas money for Adrienne's drive; Vega's advice to Adrienne that she solicit Defendant for help obtaining a car for the drive to Kansas City; Defendant's 25 phone calls to Adrienne on the day that she was arrested; his conversation with Vega about there being no reason for Adrienne to "make mistakes" on her drive; Adrienne's using a fake name for Defendant in her phone contact list; and Defendant's driving to Kansas to bail Adrienne out of jail after her arrest. This evidence shows much more than mere association among Defendant and the couriers. From this evidence, the jury could reasonably infer that Defendant conspired to traffic drugs with Vega, Salazar, Adrienne, and Angela.

On appeal Defendant lists "essential acts" allegedly necessary for his conviction, none of which, he asserts, "have been proven to have been performed by Alcorta." Aplt. Br. at 68. Those "essential acts" include procuring, packaging, and loading methamphetamine; obtaining a car to transport it; locating a Kansas buyer; negotiating the sale; and recruiting the drivers. But Defendant does not cite a single case requiring any of those acts for a conspiracy conviction. Based on the circumstantial evidence in this case, a reasonable juror could be convinced beyond a reasonable doubt that Defendant was an integral part, probably the leader, of a conspiracy to distribute methamphetamine. Nothing more is needed.

## II.    ADMISSIBILITY OF RECORDED CONVERSATIONS

Defendant challenges the admission of a number of conversations recorded by the jails where his coconspirators were incarcerated.  We can summarily dispose of his claim that admission of the conversations violated his rights under the Confrontation Clause of the Sixth Amendment.  The Confrontation Clause "prohibits the introduction of *testimonial statements* by a nontestifying witness, unless the witness is unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Ohio v. Clark*, 135 S. Ct. 2173, 2179 (2015) (internal quotation marks omitted) (emphasis added).  A "testimonial statement" is one made with the primary purpose of creating evidence for the prosecution. *See id.* at 2180.  The statements here—jailhouse conversations between criminal codefendants (none of whom were cooperating with the government)—do not satisfy that definition because that was not their purpose; quite the opposite. *See United States v. Patterson*, 713 F.3d 1237, 1247 (10th Cir. 2013) ("[S]tatements . . . made in furtherance of a conspiracy . . . are nontestimonial and present no Sixth Amendment problem.").

Defendant's more plausible challenge is that the conversations were inadmissible hearsay.  The federal hearsay rule begins by defining a *statement* as "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion," Fed. R. Evid. 801(a), and then defines *hearsay* as a statement, other than one made by the declarant while testifying at the current trial or hearing, "offer[ed] in evidence to prove the truth of the matter asserted in the statement," *id.* 801(c).  Excluded

from that definition, however, is any statement "made by the party's coconspirator during and in furtherance of the conspiracy." *Id*. 801(d)(2)(E).

Before admitting statements into evidence under the coconspirator exception to the hearsay rule, the district court must determine by a preponderance of the evidence that (1) a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, and (3) the statements were made in the course of and in furtherance of the conspiracy. *See United States v. Morgan*, 748 F.3d 1024, 1036 (10th Cir. 2014). Of central importance here is the in-furtherance requirement of the Federal Rules of Evidence, which "embodies the drafters' desire to strike a balance between the great need for conspirators' statements in combating undesirable criminal activity which is inherently secretive and difficult of proof, and the need to protect the accused against idle chatter of criminal partners as well as inadvertently misreported and deliberately fabricated evidence." *United States v. Perez*, 989 F.2d 1574, 1578 (10th Cir. 1993) (internal quotation marks omitted). A wide array of statements can fit this requirement, including those made "to induce enlistment or further participation in the group's activities; . . . to prompt further action on the part of conspirators; . . . to reassure members of a conspiracy's continued existence; . . . to allay a co-conspirator's fears; and . . . to keep co-conspirators abreast of an ongoing conspiracy's activities." *Id.* (internal quotation marks omitted).

The trial court must state on the record its findings on the elements of the coconspirator exception. *See United States v. Rascon*, 8 F.3d 1537, 1541 (10th Cir. 1993). On appeal, "while the ultimate issue of the admission or exclusion of evidence is

20

reviewed for an abuse of discretion, preliminary foundational determinations, such as whether statements offered under Rule 801(d)(2)(E) were made during the course of and in furtherance of a conspiracy, are factual findings, reviewed for clear error." *United States v. Williamson*, 53 F.3d 1500, 1517 (10th Cir. 1995) (internal quotation marks omitted). "Clear-error review asks whether, on the entire evidence, the appellate court is left with the definite and firm conviction that a mistake has been committed." *United States v. Zar*, 790 F.3d 1036, 1046 (10th Cir.) (brackets and internal quotations marks omitted), *cert. denied,* 136 S. Ct. 562 (2015).

Defendant makes the following five arguments on appeal: (1) the district court failed to make findings on the record that he was a coconspirator and that the statements were made in the course of and in furtherance of the conspiracy; (2) the district court failed to make a finding that the government rebutted the purported presumption that statements by incarcerated coconspirators do not further the conspiracy; (3) the recorded conversations before the June 21 arrests were not in furtherance of the conspiracy because they did not further the delivery thwarted by the June 21 arrests; (4) the conversations after the June 21 arrests were not made during the course of the conspiracy or in furtherance of the conspiracy because the conspiracy was thwarted by those arrests; and (5) there was insufficient nonhearsay evidence that Defendant participated in the conspiracy. We consider these arguments in turn.

**A. District Court Findings**

We reject as factually inaccurate Defendant's allegation that the district court failed to find on the record that he was a coconspirator and that the recordings admitted

21

against him were made in the course of and in furtherance of the conspiracy. The court followed the preferred procedure of this circuit and conducted two lengthy hearings (the transcripts for these hearings totaled more than 200 pages) under *United States v. James*, 590 F.2d 575 (5th Cir. 1979), to determine if the coconspirator exception was satisfied. *See United States v. Townley*, 472 F.3d 1267, 1273 (10th Cir. 2007) (noting circuit's strong preference for *James* hearings). At the first *James* hearing the court heard testimony from Officer Proffitt and ruled that "the government ha[d] shown by a preponderance of evidence that a conspiracy existed and that it included the defendants . . . ." Aplt. App. Vol. III at 544. At the second hearing the court questioned how specific conversations fit within the coconspirator exception. The government provided various rationales for the challenged statements. And it withdrew Exhibit 6 (Conversation 6-3) after admitting that it did not fit the coconspirator exception.

At the hearing the court provisionally admitted most of the calls offered under the coconspirator exception, subject to the government's connecting those statements to the conspiracy during trial. The court excluded four calls from its provisional ruling (eventually excluding three of those from trial) and also reserved its decision on two of the calls until it received additional briefing about whether statements made to conceal a conspiracy can be in furtherance of the conspiracy. On the second day of trial the court admitted the provisionally admitted recordings into evidence over Defendant's objection. On the third day of trial the court held that statements for the purpose of concealing the ongoing conspiracy were in furtherance of the conspiracy, and were therefore admissible.

22

At the conclusion of the government's case, the court found that "the government ha[d] carried its burden by a preponderance of the evidence to establish that a conspiracy existed and that the defendants in this case were participants in it and that the [admitted statements] are statements that were made by coconspirators in furtherance and in the course of the conspiracy." Aplt. App. Vol. VII at 1760. In our view, the court made all the required findings. There was no need for the court to go through each particular statement and repeat its finding.

## B. In-Furtherance Requirement

Defendant contends that all the calls, except the 14 in which he participated, were improperly admitted because they were not in furtherance of the conspiracy. He raises three arguments, all based on the timing of the couriers' arrests, not on the content of the statements. We are not persuaded. Defendant misconceives the scope and duration of the conspiracy and what can be in furtherance of a conspiracy.

To be sure, to qualify for the coconspirator exception a statement must have been made during the conspiracy. *See* Fed. R. Evid. 801(d)(2)(E); *Perez*, 989 F.2d at 1579. Statements made after the objectives of the conspiracy have either failed or been achieved are not made during the conspiracy and must be excluded. *See Perez*, 989 F.2d at 1579. Therefore, when an arrest terminates the conspiracy, postarrest statements of any kind, including those made to prevent detection or punishment for the terminated conspiracy, are inadmissible because they were not made during the conspiracy. *See Krulewitch v. United States*, 336 U.S. 440, 442–43 (1949) (postarrest statements are inadmissible when central aim of conspiracy was foiled by arrest).

23

But "a conspiracy does not end simply because one conspirator has been arrested," and "a conspirator's arrest or incarceration by itself is insufficient to constitute his withdrawal from the conspiracy." *United States v. Melton*, 131 F.3d 1400, 1405 (10th Cir. 1997). When a conspiracy is ongoing, statements that relate to "avoiding detection by law enforcement personnel" can be in furtherance of the conspiracy. *Williamson*, 53 F.3d at 1520; *see United States v. Wolf*, 839 F.2d 1387, 1393 (10th Cir. 1988) ("[C]oncealment of the crime done in furtherance of the main criminal objectives of the conspiracy falls within the coconspirator exception.").

Defendant's first timing argument concerns all statements made by coconspirators after their arrests. He complains that the district court "made no findings to rebut the presumption that incarcerated co-conspirators' statements do not further the conspiracy because of their proximity and inability to contribute to the achievement of a conspiratorial objective." Aplt. Br. at 49. But Defendant's sole cited support for such a presumption is a concurring opinion from another circuit. *See United States v. Martinez*, 430 F.3d 317, 344–45 (6th Cir. 2005) (Gilman, J., concurring). And even that opinion ends up stating that "[w]hether the presumption that the arrested declarant is no longer a coconspirator is characterized as a starting point for the analysis or as a formal rebuttable presumption is of little significance because the government has the ultimate burden of proving admissibility under 801(d)(2)(E) by a preponderance of the evidence." *See id.* at 344. Thus, the proposed "presumption" would not add to the district court's duties. The district court needed to do nothing more than decide whether the government met its

24

burden of showing admissibility by a preponderance of the evidence. *See Morgan*, 748 F.3d at 1036. That is exactly what it did.

Defendant's second timing argument is that the conversations before the June 21 arrests were not in furtherance of the conspiracy because they were not "related to the upcoming June 21st drug transport." Aplt. Br. at 52. But statements can be in furtherance of the conspiracy if they were intended to promote *any* conspiratorial objective, not just *one* objective. *See Perez*, 989 F.2d at 1578. For example, Vega's statement to Holguin on May 4 that she must tell Defendant to "get rid of his phone" was meant to help Defendant avoid detection by law enforcement. Ex. 6 (Conversation 6-1). "Avoiding detection by law enforcement officials clearly furthers the aims of a [continuing] conspiracy." *Williamson*, 53 F.3d at 1520 (internal quotation marks omitted).

Also, Defendant's argument is wrong on the facts. Even if a conversation needed to relate to a planned drug delivery, the government sufficiently proved that Adrienne and Angela transported drugs not once, but twice, and some of the admitted statements were made to further those trips. For example, Vega coached Adrienne to avoid ruse drug checkpoints during her first trip and before her second trip. Those instructions were indisputably in furtherance of drug deliveries.

We likewise reject Defendant's third timing argument: that calls after June 21 could not be in furtherance of the conspiracy because the conspiracy terminated upon the arrests of Adrienne and Angela. That argument is based on an erroneous factual premise. As the district court found, the conspiracy did not terminate; it was ongoing. There was

evidence that Adrienne continued to work for Defendant after her arrest. Defendant bailed her out of jail, and she returned to Los Angeles. On June 30, Vega encouraged her to solicit Defendant's financial assistance. She took his advice, telling Vega on July 12 that she had been doing "jobs" for Defendant. *See* Ex. 6 (Conversation 6-59). Proffitt testified that "jobs" referred to "making [drug] sales locally and bringing in money," a reasonable inference in light of her earlier drug trafficking. Aplt. App. Vol. VI at 1467.[2] And given that the arrests of couriers Vega and Salazar did not end Defendant's drug operations, there is no reason to believe that the operation ended with the arrests of Angela and Adrienne.

In addition to the arguments that have just been addressed, Defendant has set forth (in his briefs and in a postargument letter under Fed. R. App. P. 28(j)) brief summaries of several coconspirator recorded statements that he contends, without any additional argument, were inadmissible because not in furtherance of the conspiracy. Because of the absence of additional argument, he has waived any right he has to our further review of the admissibility of the statements. But we have examined them anyway and confirm that the district court did not err in admitting them.

---

[2] Some of the evidence that the conspiracy was ongoing was not offered against Defendant at trial (for reasons not apparent to us). But the district court could nonetheless rely on this evidence to make the preliminary factual determinations required by Fed. R. Evid. 801(d)(2)(E). The court is not bound by the hearsay rules when making those determinations. *See* Fed. R. Evid. 104(a); *Bourjaily v. United States*, 483 U.S. 171, 178 (1987).

For some of the statements, the district court instructed the jury not to consider them against Defendant, and we presume that the jury obeys such instructions.[3] *See Morgan*, 748 F.3d at 1043. Other "statements" were not *statements* as defined by Fed. R. Evid. 801(a) because they were not intended as assertions; they were questions[4] or requests.[5] *See United States v. Cesareo-Ayala*, 576 F.3d 1120, 1128–29 (10th Cir. 2009) (questions asserted nothing so they were not hearsay). Others were assertions but were not offered as evidence of the truth of the assertions, because the truth was irrelevant or already clear.[6] *See id.* at 1129. Others could reasonably be viewed as in furtherance of the ongoing conspiracy because they comforted coconspirators that they would be taken

---

[3] *See* Ex. 6 (Conversations 6-48, 6-58, 6-59, and 6-65); Aplt. App. Vol. I at 169 (Jury Instruction No. 15).

[4] *See, e.g.*, Ex. 6 (Conversation 6-1: Vega asks, "What is Ray going to do? He isn't going to do anything to help us?"); (Conversation 6-30: Vega asks, "What's up with Ray, have you talked to Ray today?"); (Conversation 6-31: Vega asks, "Did you talk to Ray yesterday?"); (Conversation 6-46: Vega asks Adrienne if she thinks Angela will cooperate with the authorities.).

[5] *See, e.g.*, Ex. 6 (Conversation 6-2: Vega tells Holguin, "[M]ake sure that Ray . . . Ray don't forget about me or Karmin either, please." Vega also requests prison information.); (Conversation 6-5: Salazar tells Vega, "Don't say names." Vega also tells Holguin, "Make sure that you have money in the books and anything for us."); (Conversation 6-54: Vega tells Adrienne, "Tell Ray to help you get your car back.").

[6] *See, e.g.*, Ex. 6 (Conversation 6-1: Vega's assertion that he has no money is not relevant for its truth, but is part of his request to Holguin to tell Defendant that he has no money. Whether or not he lacks money is irrelevant. What is relevant is that he thinks Defendant would help him out, showing their relationship.); (Conversation 6-4: Salazar's statement to Holguin that the police searched her phone is not offered for its truth (the police obviously knew what they had searched) but to show that she thought Holguin would want to know.); (Conversation 6-18: Adrienne's statements that Defendant returned to "home sweet home" is not offered for its truth (which was established by other evidence) but to show Adrienne's knowledge of his return.); (Conversation 6-27: It is irrelevant whether Vega is telling the truth when he says how much personal-use money or drugs he needs from Defendant for a drug-trafficking trip; the statement is relevant only to show his relationship to Defendant.).

care of (so that they would perform their tasks and remain loyal), kept coconspirators advised of the ongoing investigation (so that they could take proper precautions and make appropriate plans), or helped them execute their tasks.[7]

### C. Nonhearsay Evidence of Defendant's Participation in the Conspiracy

Finally, Defendant argues that the government failed to present sufficient independent evidence, aside from the coconspirator hearsay sought to be admitted, for the district court to determine that he was a member of the conspiracy. In *Bourjaily v. United States*, 483 U.S. 171, 180 (1987), the Supreme Court held that courts making factual determinations under Rule 801(d)(2)(E) may consider the hearsay statements sought to be admitted, but did not decide whether courts could rely solely on the hearsay statements to make those determinations. *See id.* at 181. Since then we have held that *Bourjaily* requires at most that there be some independent evidence linking the defendant to the conspiracy. *See United States v. Owens*, 70 F.3d 1118, 1124–25 (10th Cir. 1995). This evidence need not be "substantial." *Id.* at 1125.

---

[7] *See, e.g.*, Ex. 6 (Conversation 6-1: Vega's assertion to Holguin that Salazar took the blame for the drugs in the car comforts coconspirators that Salazar will not inform the authorities about them and lets them know that Vega may soon be available to traffic again.); (Conversation 6-5: Vega's statement to Salazar that Defendant put money on their accounts serves to preserve the cohesiveness of the conspiracy and placates her, thereby helping to conceal the participation of Defendant and Vega in the conspiracy.); (Conversation 6-25: Vega's statement to Adrienne that people can get in trouble for not listening to Defendant is likely to keep Adrienne obedient to Defendant.); (Conversation 6-29: Vega's statement to Adrienne about how generous Defendant was to him encourages Adrienne to continue working for Defendant and the conspiracy.); (Conversation 6-30: Vega's statement to Adrienne emphasizing how well Defendant treats her encourages her to continue working for the conspiracy.); (Conversation 6-37: Vega's discussion of the logistics of Adrienne's drive to Kansas and his anecdotes about his prior trips help Adrienne plan and execute a successful journey.).

The government presented a good bit of incriminating nonhearsay evidence. This evidence included (1) documents bearing Defendant's name found in the vehicle that Vega and Salazar were driving, (2) Defendant's 25 phone calls to Adrienne on the day of her arrest, (3) his own June flight to Kansas City, where the drugs were delivered, and (4) all the phone calls in which Defendant participated and his text messages with Vega and Salazar before their arrests, which were admissible against him under Rule 801(d)(2)(A) as statements by an opposing party. In addition, as we have already discussed, much of the jailhouse conversation between conspirators was not hearsay because what was said was not intended as an assertion of fact or was not offered to prove the truth of the matter asserted. Taken as a whole, the nonhearsay evidence was more than adequate to link Defendant to the conspiracy. The district court did not err when finding that Defendant was a coconspirator.

## III. CONCLUSION

We **AFFIRM** Defendant's conviction.