**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 25, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

PATRICK EUGENE STEIN,

    Defendant - Appellant.

No. 19-3030

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

CURTIS WAYNE ALLEN,

    Defendant - Appellant.

No. 19-3034

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

GAVIN WAYNE WRIGHT,

    Defendant - Appellant.

No. 19-3035

_____

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 6:16-CR-10141-EFM)**

_____

Meredith B. Esser, Assistant Federal Public Defender, (and Virginia L. Grady, Federal Public Defender, on the brief), Denver, Colorado, for Defendant – Appellant Patrick Eugene Stein.

Paige A. Nichols, Assistant Federal Public Defender, (and Melody Brannon, Federal Public Defender, on the briefs), Topeka, Kansas, for Defendant – Appellant Curtis Wayne Allen.

Kari S. Schmidt (and Tyler J. Emerson of Conlee, Schmidt & Emerson, LLP, on the briefs), Wichita, Kansas, for Defendant – Appellant Gavin Wayne Wright.

Erin H. Flynn, (Thomas E. Chandler, Alisa C. Philo of Department of Justice, Civil Rights Division, Appellate Section, Washington, D.C.; Stephen R. McAllister, United States Attorney, Anthony W. Mattivi, Assistant United States Attorney, District of Kansas, Topeka, Kansas; Eric S. Dreiband, Assistant Attorney General and Alexander V. Maugeri, Deputy Assistant Attorney General, Washington, D.C., on the brief), for Appellee United States of America.

_____

Before **HARTZ**, **KELLY**, and **HOLMES**, Circuit Judges.

_____

**KELLY**, Circuit Judge.

_____

Defendants-Appellants Patrick Stein, Curtis Allen, and Gavin Wright appeal from their convictions for conspiring to use a weapon of mass destruction against people and property within the United States in violation of 18 U.S.C. § 2332a(a)(2) and knowingly and willfully conspiring to violate civil rights in violation of 18 U.S.C. § 241. Mr. Wright also appeals from his false statements conviction under 18 U.S.C. § 1001(a)(2). Exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), we affirm the convictions and sentences of all three defendants.

2

**Background**

In October 2016, defendants were arrested in connection with a scheme to bomb an apartment complex and mosque in Garden City, Kansas. The arrests were the result of an extended FBI investigation involving an undercover informant, Dan Day, who joined defendants' militia, Kansas Security Force (KSF), to monitor what the FBI considered a threat to public safety.

In June 2016, defendants began planning an attack on local Muslims in response to the Pulse nightclub shooting in Orlando, Florida, which was carried out by an American citizen of Afghan descent. At the FBI's request, Mr. Day recorded defendants' meetings and telephone communications discussing the details of the attack, including possible targets and methods of attack. Over the course of several meetings, defendants decided to target the West Mary Street apartment and mosque complex, where defendants believed a large number of Somali immigrants resided. Defendants pursued various strategies for obtaining explosives to carry out the attacks, including manufacturing their own explosives and meeting with an FBI undercover employee ("UCE") posing as an arms dealer.

Mr. Allen was arrested first, after his girlfriend filed a domestic violence report against him and told police she had seen Mr. Allen and Mr. Wright manufacturing explosives at Mr. Wright's business. Two days later, Mr. Stein was arrested when he attempted to deliver cash and 300 pounds of fertilizer to the UCE in exchange for the UCE's help constructing an explosive. Mr. Wright was arrested later that day. While executing search warrants on defendants' property, the FBI

3

discovered, among other things, materials for making explosives and a draft manifesto addressed to "the U.S. government and [] the American people," urging government officials and private citizens to stop "the sellout of this country."

Defendants were charged with two separate conspiracies: (1) conspiring to use a weapon of mass destruction against people and property within the United States in violation of 18 U.S.C. § 2332a(a)(2) and (2) knowingly and willfully conspiring to violate the civil rights of the residents of the 312 West Mary Street apartment complex in violation of 18 U.S.C. § 241. The government also charged Mr. Wright with making materially false statements to the FBI in violation of 18 U.S.C. § 1001(a)(2).

Prior to jury selection, defendants challenged the jury selection plan under the Jury Selection and Service Act ("Jury Act"). Under the challenged plan,[1] grand jurors were drawn from each of the District of Kansas's six judicial divisions, while petit jurors were drawn only from the three divisions with an active federal courthouse. These three divisions do not include the Dodge City division where most of defendants' conduct took place. The district court rejected the challenge on the merits. At defendants' request, the district court also held a pre-trial hearing to determine whether the recordings of defendants' meetings and phone calls were

---

[1] On March 4, 2020, the Chief Judge for the District of Kansas issued an administrative order amending the district's petit jury selection procedure to draw from all six judicial divisions. See In re Administration of Jury Plan Pursuant to D. Kan. Rule 38.1, Administrative Order No. 2020-1 (Mar. 4, 2020). The order still permits the creation of petit jury panels from a single division as practical.

admissible as coconspirator statements under Fed. R. Evid. 801(d)(2)(E).  Over the course of the three-day hearing, the district court ruled that most of the statements the government intended to offer were admissible.

The case proceeded to a jury trial.  The government called 15 witnesses, including undercover informant Dan Day, and introduced more than 500 exhibits, hundreds of which were audio or video recordings.  Defendants called 10 witnesses and introduced nearly 40 exhibits but did not testify themselves. At the close of evidence, defendants requested that the district court instruct the jury on an entrapment defense.  The district court found that defendants had failed to establish an evidentiary basis for entrapment and declined to offer the instruction.

The defendants were convicted on all counts.  At sentencing, the district court applied the terrorism enhancement over defendants' objections and varied downward from defendants' guidelines range of life imprisonment, sentencing Mr. Allen to 300 months' imprisonment, Mr. Wright to 312 months' imprisonment, and Mr. Stein to 360 months' imprisonment.

## Discussion

All three defendants challenge their convictions and sentences on three grounds: (1) the method of petit jury selection violated the Jury Act, (2) the district court improperly refused to instruct the jury on entrapment, and (3) the district court erred in applying the terrorism enhancement at sentencing.  Mr. Wright also raises several additional challenges in which his co-defendants do not join.

5

**A. Jury Selection**

Prior to trial, defendants challenged the district court's jury selection plan, in which the petit jury pool was drawn only from the Wichita/Hutchinson division, where the courthouse is located, and not from the Dodge City division. The district court rejected the challenge on the merits. On appeal, defendants argue that the exclusion of jurors from the Dodge City division violated the Jury Act's policy "that all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States," and that, as a result, they are entitled to a new trial. 28 U.S.C. § 1861. We review the district court's legal conclusions under the Jury Act de novo and any underlying factual determinations for clear error. United States v. Kamahele, 748 F.3d 984, 1022 (10th Cir. 2014).

A defendant must raise a Jury Act challenge "before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier." 28 U.S.C. § 1867(a). In addition, the challenge requires a "sworn statement of facts" showing a substantial failure to comply with the Act. 28 U.S.C. § 1867(d). "Strict compliance with these procedural requirements is essential." United States v. Contreras, 108 F.3d 1255, 1266 (10th Cir. 1997); see also United States v. Morales, 108 F.3d 1213, 1218 (10th Cir. 1997). In Contreras, we cautioned against "ad hoc review" of the Jury Act's procedural requirements given that the statute provides a remedy for substantial violations without a showing of prejudice. 108 F.3d at 1266. A defendant's failure to file a challenge within seven days after being put on notice of

6

the allegedly deficient jury selection procedures precludes a Jury Act claim. See United States v. Windrix, 405 F.3d 1146, 1157 (10th Cir. 2005).

Defendants' Jury Act motions were untimely. Defendants were on notice of the jury selection plan as early as the November 16, 2017 status conference where, in response to defendants' concerns regarding prejudicial media coverage in Southwest Kansas, the jury coordinator confirmed that petit jury pools were drawn only from the Wichita/Hutchinson division. Under the Jury Act, defendants had seven days from this time (i.e., through November 23, 2017) to file a compliant motion challenging this practice. 28 U.S.C. 1867(a); see also Windrix, 405 F.3d at 1157. This they did not do.

Defendants' first Jury Act motion (urging the court to summon jurors from the Dodge City division) was not filed until December 8, 2017 and, as the government pointed out, lacked a sworn statement of facts. The district court denied the motion on January 17, 2018. Six days later, on January 23, 2018, defendants filed their second Jury Act motion containing a sworn statement of facts. Defendants plainly recognized the timeliness problem, arguing that their first Jury Act challenge was really an attempt to "nullify" the issue and that the seven-day clock began running when the district court denied their first motion. In arguing for the district court's denial of the second motion, the government reiterated the procedural requirements of the Jury Act.

Although defendants argue that the government waived the issue by merely reciting the procedural requirements and addressing the merits, we disagree. The

7

government did not intentionally relinquish or abandon in the district court any procedural challenge to defendants' Jury Act motion; it simply did not make such an argument. See United States v. Carrasco-Salazar, 494 F.3d 1270, 1272 (10th Cir. 2007). This failure of course does not prevent us from affirming the district court's judgment on this ground, even though the court did not address any procedural deficiencies of the motion. See Richison v. Ernest Grp., Inc., 634 F.3d 1123, 1130 (10th Cir. 2011). And the matter was clearly before the district court. Defendants' second Jury Act motion plainly raises the issue, arguing that it was timely because the jury coordinator's statement only reflected past practice and the district court could have altered the plan in response to defendants' first Jury Act motion. This argument, however, is not persuasive; defendants had enough to go on after being informed of the practice at the November 16 hearing. The bottom line is that defendants filed a non-compliant Jury Act motion well over seven days after being put on notice of the jury selection plan. Accordingly, their Jury Act challenge must be rejected as procedurally barred under our precedent.

Moreover, even if the challenge were not procedurally barred, it fails on the merits. The Jury Act provides remedies when a jury selection procedure "involves a substantial failure to comply with the statute." Kamahele, 748 F.3d at 1022; 28 U.S.C. § 1867(a). "A failure is considered 'substantial' when it 'frustrates one of the three principles underlying the Act': (1) the random selection of jurors, (2) culling of the jury from a fair cross-section of the community, and (3) determination of disqualifications, exemptions, and exclusions based on objective criteria."

8

<u>Kamahele</u>, 748 F.3d at 1022 (quoting <u>United States v. Carmichael</u>, 560 F.3d 1270, 1277 (11th Cir. 2009)).  A technical deviation from the provisions of the Jury Act will not be considered a substantial failure to comply if it does not "result in impermissible forms of discrimination and arbitrariness."  <u>United States v. Bailey</u>, 76 F.3d 320, 322 (10th Cir. 1996) (quoting <u>United States v. Gregory</u>, 730 F.2d 692, 699 (11th Cir. 1984)).

Defendants argue that the exclusion of petit jurors from the Dodge City division is a substantial failure to comply with the Jury Act in that it prevents the random selection of jurors and involves the de facto creation of a new category of exclusion.

The jury selection plan did not prevent the random selection of jurors.  The randomness principle underlying the Jury Act "requires a system of selection that affords no room for impermissible discrimination against individuals or groups."  <u>Carmichael</u>, 560 F.3d at 1277 (citation omitted).  Defendants contend that randomness is not possible when half of a district's divisions are not summoned for jury service, but they fail to identify "an identifiable and cognizable segment of the community" excluded from the jury pool in a manner that frustrates the Jury Act's purpose.  <u>See</u> <u>Bailey</u>, 76 F.3d at 323 (citation omitted).  Geographical imbalance, absent evidence of discrimination or discriminatory effects, is insufficient to establish a substantial failure to comply with the Jury Act.  <u>See</u> <u>id.</u>; <u>United States v. Test</u>, 550 F.2d 577, 581 n.4 (10th Cir. 1976).

9

Similarly, the selection of jurors only from judicial divisions with an active federal courthouse did not constitute the creation of a new category of exclusion in violation of the Jury Act. We have rejected the argument that the exclusion of jurors based on the judicial division in which they reside violates the Jury Act, recognizing instead that "the partitioning of a district into jury divisions is sanctioned by [the Jury Act], and is clearly not unconstitutional, absent evidence that some cognizable group has been systematically excluded by 'gerrymandering' the division lines." Test, 550 F.2d at 594. Again, defendants fail to identify a cognizable group systematically excluded from the petit jury pool as a result of this practice.

## B. Entrapment Instruction

Defendants next argue that the district court erred in declining to instruct the jury on an entrapment defense. "Whether there is evidence sufficient to constitute a triable issue of entrapment is a question of law which we review de novo," viewing the evidence in the light most favorable to the defendant. United States v. Vincent, 611 F.3d 1246, 1249–50 (10th Cir. 2010) (internal quotations omitted).

"[A] defendant is entitled to have a jury consider any defense which is supported by the law and has sufficient foundation in the evidence to create a genuine issue of fact." United States v. Ortiz, 804 F.2d 1161, 1163 (10th Cir. 1986). To raise a valid entrapment defense, a defendant must show an evidentiary basis on which the jury could find (1) "government inducement of the crime," and (2) "a lack of predisposition on the part of the defendant to engage in the criminal conduct." Mathews v. United States, 485 U.S. 58, 62–63 (1988). A defendant may do this

10

"either by presenting his own evidence or by pointing to evidence presented by the government," United States v. Scull, 321 F.3d 1270, 1275 (10th Cir. 2003), but "conclusory and self-serving statements," such as suggestions that the jury could disbelieve evidence presented at trial, alone will not suffice. See Ortiz, 804 F.2d at 1165–66. The fact that the government employed deceit or persuasive tactics in investigating criminal activity is insufficient to establish entrapment. United States v. Russell, 411 U.S. 423, 435–36 (1973); Vincent, 611 F.3d at 1250–51.

Taken in the light most favorable to defendants, the evidence presented at trial did not create a triable issue as to inducement. Inducement is "government conduct which creates a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense." Ortiz, 804 F.2d at 1165. Defendants did not testify, and primarily point to evidence presented by the government in arguing that there was an evidentiary basis for an entrapment instruction at trial. Specifically, defendants contend that there was evidence that Mr. Day proposed the location and time defendants ultimately chose for the attack, was the first to show the location to Mr. Stein, urged defendants to meet with the UCE and to develop explosives, and made sustained efforts to appeal to defendants' ideologies, including by echoing defendants' attitudes towards Muslims. Defendants also argue that the FBI's use of a UCE posing as an arms dealer, as well as its efforts to build chargeable offenses, further supported a finding of inducement.

The government responds that the actual evidence at trial reflects that the defendants, not Mr. Day or the UCE, originated a plan to kill innocent Muslims with

11

explosives. It does appear from the record that (1) Mr. Stein did not first learn about the Mary Street apartment complex from Mr. Day, but rather through his involvement in a different militia; (2) Mr. Stein asked Mr. Day to show him the location of the complex in daylight; and (3) Mr. Allen and Mr. Wright were engaged in their own efforts to develop explosives at the time they resisted meeting with the undercover agents posing as arms dealers.

Defendants counter that these findings improperly "presume[] the truth of" impeached government witnesses' testimony. However, the suggestion that the jury could have disbelieved or disregarded this evidence is insufficient without pointing to evidence in the record to support a contrary finding. See Ortiz, 804 F.2d at 1165–66 (explaining that "conclusory and self-serving statements, standing alone," will not establish a triable issue of inducement). In any event, even if defendants' characterizations of the evidence found support in the record, evidence that a government agent encouraged or solicited a defendant to engage in criminal conduct, without more, is insufficient to constitute inducement. Vincent, 611 F.3d at 1250–51; Ortiz, 804 F.2d at 1165. After a review of the record, we are satisfied that the district court's assessment is correct.

Nor can defendants demonstrate a basis for finding a lack of predisposition, even viewing the evidence in the light most favorable to the defendants. Predisposition is "a defendant's inclination to engage in the illegal activity for which he has been charged," and may be demonstrated by a defendant's "eagerness to participate in" the illegal activity. United States v. Fadel, 844 F.2d 1425, 1433

12

(10th Cir. 1988). Defendants argue that, among other things, their quiet lives prior to their arrests demonstrate a lack of predisposition. Mr. Wright argues further that his past business dealings with Muslims demonstrate a lack of predisposition, and Mr. Stein argues that his "anti-Muslim sentiments and grandiose schemes" never materialized into action prior to Mr. Day's involvement.

These arguments overlook the fact that defendants were charged with conspiracies. While conspiracy "cannot exist without at least the degree of criminal intent necessary for the substantive offense itself," Ingram v. United States, 360 U.S. 672, 678 (1959), predisposition is judged by examining whether defendants were "ready and willing to commit the crime" for which they were charged — here, conspiracy to use weapons of mass destruction and to violate the civil rights of local Muslims. Ortiz, 804 F.2d at 1165. There is extensive evidence over time of defendants' eagerness to enter into this conspiracy. Defendants' rhetoric regarding Muslims predated Mr. Day's involvement, and their actions, independent of Mr. Day, to develop a bomb for use in the attack do not support the notion that they were not predisposed to be involved in such a conspiracy or that their plans would not have materialized absent Mr. Day's involvement. Accordingly, defendants failed to raise a triable issue as to entrapment and the district court did not err in declining to offer an entrapment instruction.

### C. Terrorism Enhancement

Defendants next challenge the district court's application of the terrorism enhancement under § 3A1.4 of the Sentencing Guidelines. "We review the district

13

court's application of the Sentencing Guidelines for abuse of discretion."  United

States v. Rodriguez, 945 F.3d 1245, 1248 (10th Cir. 2019).  "In applying that

standard, we review questions of law de novo and factual findings for clear error."

Id. at 1249.

Defendants first argue that, because application of the terrorism enhancement

significantly increased their guidelines range, it should have been subject to the clear

and convincing standard of proof, rather than a preponderance of the evidence.

In general, factual findings at sentencing must be supported by a

preponderance of the evidence.  United States v. Robertson, 946 F.3d 1168, 1171

(10th Cir. 2020).  While "we have left open the possibility that due process may

require proof by clear and convincing evidence" where an enhancement "increases a

sentence by an extraordinary or dramatic amount," United States v. Ray, 704 F.3d

1307, 1314 (10th Cir. 2013) (internal quotations omitted), we have never held that a

sentencing enhancement was subject to the clear and convincing standard based on its

disproportionate impact on the guidelines range.[2]  United States v. Olsen, 519 F.3d

1096, 1105 (10th Cir. 2008).  Here, the terrorism enhancement increased defendants'

guideline ranges from approximately 15–20 years to life imprisonment and

defendants ultimately received sentences ranging from 25 to 30 years.  To the extent

---

[2] To the contrary, in several cases we have stated explicitly that the argument
for a higher standard of proof at sentencing for contested facts has been foreclosed in
this circuit.  See Robertson, 946 F.3d at 1171; United States v. Constantine, 263 F.3d
1122, 1125 n.2 (10th Cir. 2001); United States v. Valdez, 225 F.3d 1137, 1143 n.2
(10th Cir. 2000); United States v. Washington, 11 F.3d 1510, 1516 (10th Cir. 1993).

that an argument for a higher standard of proof for enhancements resulting in an extraordinary sentence increase is available in this circuit, this case does not involve such an increase. [3]

Second, defendants argue that the district court erred in applying the terrorism enhancement under any standard of proof because their offense was not primarily calculated to influence or retaliate against government conduct.

In relevant part, the terrorism enhancement applies to offenses that are "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." U.S.S.G. § 3A1.4, cmt. 1; 18 U.S.C. § 2332b(g)(5). Section 3A1.4 also provides for an upward departure where the defendant's "motive was to intimidate or coerce a civilian population," rather than to influence or retaliate against government conduct. U.S.S.G. § 3A1.4, cmt. 4.

Defendants contend that because the primary target of their offense was a civilian population, i.e., the Muslim residents of the West Mary Street apartment complex, the district court should have imposed an upward departure rather than the full terrorism enhancement. However, "[t]he terrorism enhancement applies so long as [defendants'] conduct was 'calculated . . . to retaliate against government

---

[3] Defendants also preserve for further review the argument that, because their sentences can be upheld as reasonable only because of the existence of judge-found facts, the sentences violate their Sixth Amendment right to trial by jury and Fifth Amendment due process rights. See Rita v. United States, 551 U.S. 338, 375 (2007) (Scalia, J., concurring). As defendants acknowledge, this argument is foreclosed by circuit precedent. See United States v. Redcorn, 528 F.3d 727, 745–46 (10th Cir. 2008).

15

conduct,' even if it was also calculated to accomplish other goals simultaneously."

United States v. Van Haften, 881 F.3d 543, 545 (7th Cir. 2018) (quoting 18 U.S.C. § 2332b(g)(5)(A)); see also United States v. Wright, 747 F.3d 399, 408 (6th Cir. 2014); United States v. Awan, 607 F.3d 306, 317 (2d Cir. 2010). While it is true that defendants were motivated by a strong anti-Muslim sentiment, there is ample evidence demonstrating that defendants' offenses were also calculated to influence or retaliate against government conduct. Defendants' manifesto was addressed to the U.S. government and aimed to "wake up the American people" to the "tyrannical government." It continued: "It must be understood by all just what our government is up to. . . Not enforcing our borders, illegally bringing in Muslims by the thousands, top U.S. officials being above the law, top officials in our government taking donations of bribes from foreign nations." The evidence introduced at trial also included numerous references by defendants to the immigration policy of the Obama administration as a motivating factor for the attack. This evidence supports a finding that defendants' offenses were calculated to influence or retaliate against government conduct under any standard of proof. Accordingly, the district court correctly applied the terrorism enhancement.

**D. Defendant Wright's Claims**

In addition to the claims discussed above, Mr. Wright brings four additional challenges to his conviction and sentence in which his co-defendants do not join.

16

### 1. Prosecutorial Misconduct

Mr. Wright argues that the government engaged in prosecutorial misconduct that violated his due process rights. We review allegations of prosecutorial misconduct de novo. United States v. Caballero, 277 F.3d 1235, 1248 (10th Cir. 2002).

In reviewing claims of prosecutorial misconduct, we first determine whether the conduct was improper, then whether any improper conduct warrants reversal. Id. at 1247–48. "[P]rosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial' before it will rise to the level of a due process violation" warranting reversal. Id. at 1248 (quoting Greer v. Miller, 483 U.S. 756, 765 (1987)).

Mr. Wright identifies two instances of allegedly improper conduct by the government: (1) the government's alleged delay in providing the defense with transcripts identifying the specific recorded statements the government sought to offer as coconspirator statements at trial; and (2) the government's representation that the transcripts at issue were "verified, accurate, and trustworthy," when in fact a small number of the transcripts contained misattributions.

Mr. Wright's allegation regarding the government's delay in identifying the statements to be offered as coconspirator statements is contradicted by the record. Defense counsel received the complete recordings of defendants' meetings and phone calls after defendants' arrest in October 2016. By May 11, 2017, defense counsel had also received draft transcripts of those recordings. Prior to the James hearing to

17

determine the admissibility of the statements the government planned to offer at trial, defendants received the excerpted recordings the government intended to offer as well as printed transcripts marking the excerpts of each audio clip the government planned to use. Accordingly, Mr. Wright has failed to identify government misconduct, let alone misconduct undermining his right to a fair trial. See Caballero, 277 F.3d at 1248.

Mr. Wright's allegation that prosecutors knowingly introduced false evidence in the form of inaccurate transcripts of the audio clips similarly lacks merit. In order to establish a due process violation, Mr. Wright must show that (1) the prosecution introduced false evidence, (2) the prosecution knew the evidence to be false, and (3) the evidence was material. See id. at 1243. Mr. Wright's claim fails on the first element. The transcripts were never admitted into evidence and the district court repeatedly instructed the jury that only the recordings, and not the transcripts, were to be considered as evidence. In addition, when the defense asked FBI Agent Kuhn about the transcript inaccuracies during her testimony at trial, Agent Kuhn admitted that the transcripts contained some misattributions. The government therefore did not present false evidence.

### 2. Admission of Coconspirator Statements

Mr. Wright next challenges the procedure by which the district court determined the admissibility of the recordings as coconspirator statements under Fed. R. Evid. 801(d)(2)(E). Specifically, he contends that the district court abused its discretion by (1) admitting the statements in the absence of independent evidence

18

supporting the existence of the conspiracy; and (2) evaluating entire excerpts of defendants' recorded conversations rather than evaluating each excerpt sentence-by-sentence. We review the district court's admission of coconspirator statements, including the method it uses to determine admissibility, for abuse of discretion. United States v. Alcorta, 853 F.3d 1123, 1137–38 (10th Cir. 2017); United States v. Roberts, 14 F.3d 502, 514 (10th Cir. 1993).

Statements by a party's coconspirator made "during and in furtherance of the conspiracy" are excluded from the definition of hearsay and admissible against all coconspirators. Fed. R. Evid. 801(d)(2)(E). Before statements may be admitted under this rule, the district court "must determine that (1) by a preponderance of the evidence, a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, and (3) the statements were made in the course of and in furtherance of the conspiracy." United States v. Owens, 70 F.3d 1118, 1123 (10th Cir. 1995). The "preferred procedure of this circuit" is to hold a James hearing outside the jury's presence to make preliminary findings as to whether these requirements are satisfied, Alcorta, 853 F.3d at 1138, but the district court also "may provisionally admit the evidence with the caveat that the evidence must 'connect up' during trial." Owens, 70 F.3d at 1123 (citation omitted).

A district court's preliminary conclusion that the predicate conspiracy existed at most must be supported by some "independent evidence" of the conspiracy other than the proffered coconspirator statements themselves, although such evidence need not be substantial. United States v. Lopez-Gutierrez, 83 F.3d 1235, 1242 (10th Cir.

19

1996).  Testimony of a government agent regarding his interactions or conversations with coconspirators is adequate independent evidence.  <u>Owens</u>, 70 F.3d at 1125.

Here, the district court followed the preferred procedure and held a multi-day <u>James</u> hearing to determine whether the predicate conspiracy existed.  In addition to the proffered statements themselves, the district court considered Mr. Day's observations of and contacts with Mr. Wright, as well as grand jury testimony from another witness supporting the existence of the conspiracy as early as June 14, 2016.  And by the time the statements were admitted at trial, multiple witnesses had testified to defendants' activities in connection with the conspiracy.  Accordingly, the district court did not abuse its discretion in finding that the recordings were preliminarily admissible as coconspirator statements based on the evidence produced at the <u>James</u> hearing, and that evidence was strengthened by the time the statements were admitted at trial.

Mr. Wright also challenges the district court's decision to evaluate the proffered audio clips in their entirety, instead of sentence-by-sentence.  Mr. Wright does not identify a single statement that he contends was improperly admitted as a result of the district court's election to proceed in this manner and accordingly fails to demonstrate any harm resulting from the district court's approach.  This argument is meritless.

### 3.  False Statements Charge

Next, Mr. Wright challenges the district court's denial of his motion for a judgment of acquittal on the false statements charge on two grounds.  First, he argues

20

that the government failed to prove that his statements were material. Second, he argues that the government improperly charged him under 18 U.S.C. § 1001(a)(2). The denial of a motion for a judgment of acquittal is reviewed de novo to determine whether, "viewing the evidence in the light most favorable to the government," a rational jury could have found the defendant guilty of the crime beyond a reasonable doubt. United States v. Gordon, 710 F.3d 1124, 1141 (10th Cir. 2013).

"[A] false statement is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decision-making body to which it was addressed." Neder v. United States, 527 U.S. 1, 16 (1999) (quotations omitted). Materiality does not depend on whether the statement actually influenced the decision at issue and is a "mixed question of law and fact that the jury decides." United States v. Williams, 934 F.3d 1122, 1128–29 (10th Cir. 2019).

Mr. Wright's false statements were clearly material to the federal investigation into defendants' plan to bomb the Mary Street apartment complex. When Mr. Wright was denied entry to his business following Mr. Allen's arrest, he went to the police station to find out why. While there, he agreed to an interview with agents from the FBI and Kansas Bureau of Investigation, in which he denied involvement in defendants' plan. At trial, the government introduced a video in which Mr. Wright made several false statements to state and federal investigators, including (1) he did not know anything about Mr. Allen developing explosives at his business; (2) he was not aware of any explosives located on his business's premises; (3) he did not belong to a militia; and (4) he had neither attended nor been invited to any KSF meetings.

21

The government was not required to introduce additional evidence that investigators were actually influenced by these statements. See Williams, 934 F.3d at 1129. The jury's verdict is supported by the record.

Mr. Wright also argues that the government improperly indicted him under 18 U.S.C. § 1001(a)(2) because a federal investigation is not a sufficiently discrete "decision" for purposes of the statute. In other words, Mr. Wright asks this court to hold that Section 1001(a)(2) is limited to situations in which the government must approve or deny an application and is inapplicable to criminal interviews. However, both the Supreme Court and this circuit have confirmed that a defendant's false statements to investigators in the course of a federal investigation can support a conviction under 18 U.S.C. § 1001's "false, fictitious, or fraudulent statements" clause. See Brogan v. United States, 522 U.S. 398, 400–02 (1998) (considering a prior version of 18 U.S.C. § 1001 containing the same relevant language as in 18 U.S.C. § 1001(a)(2)); Gordon, 710 F.3d at 1145.

### 4. Cumulative Error

Finally, Mr. Wright argues that to the extent any of the purported errors discussed above, or those discussed below, are deemed harmless, the cumulative effect of all errors demands reversal.

Cumulative error analysis "aggregates all the errors that individually have been found to be harmless, and therefore not reversible," and "analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." Hooper v. Mullin, 314 F.3d 1162, 1178 (10th

22

Cir. 2002) (quotations omitted). "Only actual errors are considered in determining whether the defendant's right to a fair trial was violated." United States v. Toles, 297 F.3d 959, 972 (10th Cir. 2002). Where a defendant fails to establish the existence of multiple non-reversible errors, he cannot benefit from the cumulative error doctrine. United States v. Lopez-Medina, 596 F.3d 716, 741 (10th Cir. 2010).

Mr. Wright identifies three additional purported evidentiary errors by the district court that he contends, together with those discussed above, give rise to cumulative error.

First, he argues that the district court abused its discretion by denying his request under Fed. R. Evid. 106 to play the entire recordings of each of defendants' multi-hour meetings — over a hundred hours of recordings, collectively. Rule 106 does not require that an entire statement or recording be admitted, but rather permits a court to admit additional portions of a statement when necessary to clarify or explain the portion already admitted. Lopez-Medina, 596 F.3d at 735. In requesting to play the entirety of the recordings, Mr. Wright did not identify portions of the admitted statements needing clarification, instead arguing broadly that the government's introduction of the recordings in clips was unfair. As the district court noted, Mr. Wright waited until the middle of trial to object to the introduction of the clips, despite knowing well in advance that the government did not plan to introduce entire recordings, and failed to identify specific statements requiring clarification in his objection. Accordingly, the district court reasonably found that the objection was not made in good faith and did not abuse its discretion in denying it.

23

Mr. Wright also argues that the district court erred in only allowing him to play clips of phone calls between Mr. Wright and Mr. Day during Mr. Day's cross-examination and later permitting the government to play the entire recordings on Mr. Day's redirect. However, Mr. Wright twice stated below that he had no objection to the government invoking Rule 106 to play the recordings in their entirety during Mr. Day's redirect, and accordingly has waived the argument on appeal. See United States v. Malone, 937 F.3d 1325, 1327 (10th Cir. 2019).

Finally, Mr. Wright argues that the district court abused its discretion by refusing to permit him to cross-examine Mr. Day regarding an application for Supplemental Security Income Mr. Day submitted nine months after defendants' arrest. Fed. R. Evid. 608 does not permit the admission of extrinsic evidence in order to attack a witness's character for truthfulness, but it permits the court to allow inquiries into relevant instances of conduct on cross-examination.[4] The district court permitted defense counsel to ask Mr. Day whether he reported payments from the FBI on his tax returns and the extent to which he reported the payments differently in different years. It properly refused to admit the application itself under Rule 608(b) and did not abuse its discretion in refusing to allow defense counsel to ask about the application on the basis that a separate "trial within a trial" would be necessary to establish whether Mr. Day's statements on the application were in fact untruthful.

---

[4] To the extent Mr. Wright now relies on Fed. R. Evid. 613 in support of this argument, that argument is waived because he did not raise it below and did not argue plain error on appeal. United States v. Leffler, 942 F.3d 1192, 1196 (10th Cir. 2019).

Mr. Wright has failed to establish the existence of multiple non-reversible errors. Accordingly, he cannot benefit from the cumulative error doctrine. Lopez-Medina, 596 F.3d at 741.

**AFFIRMED.**