FILED
United States Court of Appeals
Tenth Circuit

May 4, 2021

Christopher M. Wolpert
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

EBUBE OTUONYE,

     Defendant - Appellant.

No. 19-3250

_____

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 6:18-CR-10085-EFM-1)**
_____

Michael D. Kimerer, Kimerer Law Group, P.C., Phoenix, Arizona, for Defendant – Appellant.

James A. Brown, Assistant United States Attorney (Stephen R. McAllister, United States Attorney with him on the brief), Topeka, Kansas, for Plaintiff – Appellee.
_____

Before **MATHESON**, **BALDOCK**, and **MORITZ**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

Wichita pharmacist Ebube Otuonye filled prescriptions written by Dr. Steven Henson for opioids and other controlled substances. The Drug Enforcement Administration ("DEA") became suspicious of Dr. Henson's prescriptions and investigated him, which led them to Mr. Otuonye.

Based on the results of the DEA's investigation, Mr. Otuonye was indicted for conspiring to unlawfully distribute controlled substances under 21 U.S.C. § 846 (Count 1); unlawfully distributing controlled substances under 21 U.S.C. § 841(a)(1), (b)(1)(C), and 18 U.S.C. § 2 (Count 2); and Medicare and Medicaid fraud in violation of 18 U.S.C. § 1347 (Counts 3 and 4). A jury convicted Mr. Otuonye on all four counts. The district court imposed a 150-month concurrent prison sentence.

Mr. Otuonye raises seven issues on appeal. Five challenge the admission of evidence. The sixth challenges the sufficiency of the evidence for all four convictions. Finally, Mr. Otuonye argues the district court committed procedural error by miscalculating his sentencing guidelines range.

Exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), we affirm.

## I. **BACKGROUND**

### A. *Legal Background*

The Controlled Substances Act ("CSA"), 21 U.S.C. §§ 801-904, classifies controlled substances into five drug schedules based on their medical use and potential for abuse. Oxycodone, methadone, and hydromorphone, which have accepted medical uses but are highly addictive, are classified as Schedule II drugs. 21 C.F.R. § 1308.12(b)(1), (c). Alprazolam, a central nervous system depressant used to treat insomnia and anxiety, is classified as a Schedule IV drug. 21 C.F.R. § 1308.14(c)(2).

Title 21 U.S.C. § 841(a)(1) makes it unlawful, except under circumstances authorized by the statute, "for any person knowingly or intentionally . . . to manufacture,

2

distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." But 21 U.S.C. § 829 provides an exception allowing licensed, registered, or permitted practitioners to prescribe controlled substances in four of the five schedules, including Schedule II and Schedule IV. *See* 21 U.S.C. § 802(21) (defining a "practitioner" who may prescribe controlled substances).

DEA regulations implementing 21 U.S.C. § 829 specify:

> A prescription for a controlled substance to be effective must be issued for *a legitimate medical purpose by an individual practitioner* acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with *the pharmacist who fills the prescription.*

21 C.F.R. § 1306.4(a) (emphasis added). Thus, a pharmacist violates the CSA by distributing controlled substances in a manner inconsistent with the usual course of contemporary medical practice. *See United States v. Lovern*, 590 F.3d 1095, 1101 (10th Cir. 2009).

### B. *Factual Background*

### 1. DEA Investigation

In October 2014, the DEA began receiving phone calls from Wichita-area pharmacists raising concerns about the prescribing patterns of Dr. Henson—particularly his prescribing high doses of opioids and combining opioids with benzodiazepines such as Xanax (alprazolam). DEA Task Force Officer ("TFO") Mikeal Long testified at trial that, in addition to the types and doses of drugs being prescribed, the fact that "[p]atients were coming from all over to see Dr. Henson" raised suspicion. Jt. App., Vol. 7 at 1550.

3

The DEA also observed several other red flags. For example, Dr. Henson's patients often paid in cash. And once a pharmacy filled one prescription written by Dr. Henson, many of his patients would come later that day or the following day to have their prescriptions filled, suggesting coordination among patients.

a. *Neighborhood Pharmacy*

Through surveillance of Dr. Henson, the DEA identified a group of individuals who would drive from Kansas City, Lawrence, or Topeka to Wichita to buy prescriptions from Dr. Henson, have them filled at pharmacies, and sell the pills on the street.[1]

The DEA confronted Amanda Terwilleger, a member of that group. Ms. Terwilleger told investigators that some pharmacists refused to fill Dr. Henson's prescriptions, so she took her prescriptions to Neighborhood Pharmacy in Wichita. But Neighborhood had a policy requiring customers to fill three non-controlled prescriptions for every controlled prescription. Ms. Terwilleger did not have any non-controlled prescriptions.

Neighborhood Pharmacy was a retail pharmacy owned and operated by Mr. Otuonye, its pharmacist-in-charge. It was licensed by the Kansas Board of Pharmacy and the DEA to distribute controlled substances.

---

[1] The DEA also later identified a second such group from the Newton, Kansas area, spearheaded by Nick McGovern, a Dr. Henson patient. Mr. McGovern reportedly recruited others to go to Dr. Henson to get prescriptions. He would retain a portion of the drugs. Associates of Mr. McGovern testified at trial.

The DEA interviewed several other patients of Dr. Henson who reported they had difficulty filling Dr. Henson's prescriptions at other pharmacies but were able to fill them at Neighborhood Pharmacy. The investigation revealed that, beginning in October 2014, an increasing number of Dr. Henson's patients had prescriptions filled at Neighborhood.[2]

Dr. Henson's patients often traveled long distances to have their prescriptions filled at Neighborhood. At trial, TFO Kyle Twaddle presented a series of maps showing the distances between the homes of Dr. Henson's patients and Neighborhood Pharmacy. Most were outside a 2-mile radius from Neighborhood.[3] Carly Haynes, the Kansas Board of Pharmacy's Director of Compliance, had earlier testified that this was a red flag because "most patients will fill either at a pharmacy close to home or a pharmacy close to the physician." Jt. App., Vol. 10 at 2207.

b. *Evidence seized from Dr. Henson's home*

Based on its investigation, the DEA obtained and executed a search warrant at Dr. Henson's home in August 2015. At that time, Dr. Henson voluntarily surrendered his DEA registration number, so he could no longer prescribe controlled substances. The search uncovered a series of handwritten notecards appearing to reference Mr. Otuonye or Neighborhood Pharmacy. One dated October 11, 2014, said "NEIGHBORHOOD

---

[2] Only two patients had prescriptions for controlled substances written by Dr. Henson filled at Neighborhood before October 2014—one on August 28, 2014, and one on September 30, 2014.

[3] TFO Twaddle testified that the 2-mile radius was arbitrarily determined to help visualize these distances.

PHARMACY - 20%"; and another dated October 27, 2014, said "NEIGHBORHOOD PHARMACY/CAN THEY HANDLE." Jt. App., Vol. 12A at 2552-53 (Gov't Exhs. 4, 5).

Investigators also found and seized a cell phone belonging to Dr. Henson, from which they recovered text messages and voicemails. Among those text messages were several communications between Dr. Henson and his patients referencing Neighborhood Pharmacy and Mr. Otuonye. The text messages showed that Dr. Henson referred his patients to Neighborhood when they had difficulty filling their controlled prescriptions at other pharmacies.

c. *DEA interviews of Mr. Otuonye*

DEA Diversion Investigator ("DI") Patricia O'Malley spoke with Mr. Otuonye multiple times about his pharmacy's dispensing practices. In December 2017, while a search warrant was being served at the pharmacy, Mr. Otuonye admitted to her that Neighborhood Pharmacy was struggling financially before Dr. Henson's patients started coming in. The pharmacy experienced a sharp uptick in sales when Dr. Henson's patients started filling their prescriptions there, and Mr. Otuonye raised his prices.[4] Neighborhood's sales volume and prices declined after Dr. Henson surrendered his DEA registration and could no longer prescribe controlled substances. Mr. Otuonye admitted

---

[4] Mr. Otuonye told DI O'Malley that he raised his prices to discourage Dr. Henson's patients from using his pharmacy.

to DI O'Malley that the situation "looked bad," that he was "not an angel," and that "no one is perfect." Jt. App., Vol. 5 at 916.

Analysis of Neighborhood's financial data showed Mr. Otuonye charged significantly more for oxycodone, methadone, and hydromorphone when Dr. Henson prescribed them than when others prescribed them. During the conspiracy, Neighborhood filled more prescriptions written by Dr. Henson than by any other doctor. And Neighborhood's average gross profit per controlled substance prescription filled for Dr. Henson was more than six times that for any other prescriber.

Mr. Otuonye told DI O'Malley that he initially verified Dr. Henson's prescriptions by calling him to ensure they were not forgeries. He was concerned about the high quantities being prescribed. He found it odd that Dr. Henson answered his phone himself rather than using a receptionist. Mr. Otuonye met Dr. Henson in person at the Kansas Men's Clinic[5] to discuss his prescriptions approximately five times, and at Neighborhood Pharmacy at least once. At some point, Mr. Otuonye and Dr. Henson had a verbal disagreement about the large quantities of Schedule II drugs being prescribed. This prompted Dr. Henson to visit Neighborhood Pharmacy in person to ask why Mr. Otuonye was refusing to fill some of his prescriptions. At this meeting, Dr. Henson claimed he

---

[5] The Kansas Men's Clinic was one of Dr. Henson's health practices. Although it ostensibly focused on treating erectile dysfunction and not on managing pain, the Government presented evidence that Dr. Henson prescribed opioids to patients he saw at this clinic.

had inherited pain management patients from another physician, which explained the sudden increase in controlled prescriptions.

DI O'Malley testified that if Mr. Otuonye had checked K-TRACS, a Kansas online system that pharmacists and doctors can use to track controlled prescriptions, he would have been able to verify whether other physicians had previously been prescribing narcotics to Dr. Henson's "inherited" patients. In his interview with DI O'Malley, Mr. Otuonye claimed he would regularly check K-TRACS before filling prescriptions for Dr. Henson's patients. But the DEA investigation revealed he did not perform any checks on a Dr. Henson patient until January 2015.

Dr. Henson's patients told Mr. Otuonye they were having difficulty filling their prescriptions at other pharmacies. Mr. Otuonye told DI O'Malley this was because pharmacists prefer not to fill controlled substances in high quantities.

2. **The 3:1 Policy**

At trial, the Government introduced evidence that Neighborhood Pharmacy required customers to fill three prescriptions for non-controlled substances for each controlled substance prescription (the "3:1 Policy"). Mr. Otuonye communicated this policy to his customers with a printed sign:



**NOTICE TO CUSTOMERS**

Neighborhood Pharmacy requires you to have **3** active non-narcotic prescriptions in order to fill a narcotic prescription.

**OR**

Each narcotic prescription has to be accompanied by a minimum of **3** non-narcotic prescriptions.

**You may, use another Pharmacy if all you want to fill is narcotic prescription (controlled drug).**

GOVERNMENT EXHIBIT
10-a
18-10085-EFM

Joint App. Vol. 12

Jt. App., Vol. 12A at 2560 (Gov't Exh. 10-a).[6]

Mr. Otuonye explained to DI O'Malley that he instituted this policy to balance his inventory so his wholesaler would not limit his supply of controlled substances. Mr. Otuonye's only wholesaler was Pharmacy Buying Association Health ("PBA").[7] To

---

[6] The parties dispute when the 3:1 Policy was put in place and when the sign was put up. On cross-examination, DI O'Malley testified that Mr. Otuonye claimed to have first put up the sign in 2009. Data from a Neighborhood Pharmacy computer indicated that a version of the sign was created on the computer on October 16, 2014, and last modified on October 20. Nick McGovern, a Dr. Henson patient, texted a picture of the sign to Dr. Henson on October 23, 2014.

[7] PBA is a co-op of independent pharmacies. It facilitates the wholesale purchase of pharmaceuticals for its members and acts as a "middleman" between manufacturers and retail pharmacies.

ensure its retailers were purchasing an appropriate mix of controlled and non-controlled drugs, PBA's computer program automatically flagged any pharmacy that purchased more than 20 percent controlled substances, by dollar amount. That flag would cause PBA to more closely scrutinize the pharmacy's purchases of controlled substances, including opiates. DI O'Malley testified that a notecard was found at Dr. Henson's home. It read "NEIGHBORHOOD PHARMACY – 20%," suggesting Dr. Henson was aware of this 20 percent threshold. Jt. App., Vol. 12A at 2553; Jt. App., Vol. 5 at 937-38.

In 2013, PBA suspended sales to Neighborhood Pharmacy due to the high percentage and high pill count of controlled substances it was purchasing. PBA reinstated Neighborhood after a review and allowed it to purchase controlled substances again. PBA required Mr. Otuonye to provide monthly reports of his dispensing, which he did until September 2014.

Dr. Henson was made aware of the 3:1 Policy at least as early as October 22, 2014, when his patient Nick McGovern informed him about it. In response, Dr. Henson told Mr. McGovern he would write him prescriptions for Motrin, Flexeril, and an antibiotic to comply with the policy. After this exchange, Dr. Henson wrote prescriptions for several other patients reflecting the 3:1 ratio (or in at least one case, a 4:1 ratio).

On October 23, 2014, Mr. Otuonye called Dr. Henson and left a voicemail asking him to write additional non-controlled prescriptions for his patient Tamara Becker. A recording of that voicemail was played for the jury:

> Hi Doctor Henson, this is Ebube at Neighborhood Pharmacy.
> I have ah, Tamara Beck-, ah, Becker, ah we want to see if you

10

> can call in some non-narcotics to go with these.  Give me a
> call . . . .

Jt. App., Vol. 16 at 3245 (transcript); Jt. App., Vol. 8 at 1582-83 (voicemail played).

3. **Additional Trial Testimony**

   a. *Doctors and pharmacists*

Multiple registered pharmacists and medical providers testified that certain "red flags" should have put Mr. Otuonye on notice that Dr. Henson's opioid prescriptions lacked a legitimate medical purpose and were prescribed outside the normal course of professional practice.

   i. Raghad Sabra

Raghad Sabra, Mr. Otuonye's relief pharmacist at Neighborhood,[8] testified that she became suspicious when Dr. Henson's patients began coming in with prescriptions for the same Schedule II controlled substances—mainly methadone, oxycodone, and hydromorphone.  She eventually stopped filling Dr. Henson's controlled substance prescriptions because she was uncomfortable filling such high doses of narcotics, but continued filling his non-controlled substance prescriptions.  Ms. Sabra testified that Dr. Henson often prescribed these narcotics in combination with alprazolam—a benzodiazepine and Schedule IV controlled substance.  She became concerned because opioids and benzodiazepines, when taken together, can have a dangerous additive depressive effect on the central nervous system.

---

[8] Ms. Sabra was the pharmacist on duty who filled prescriptions when Mr. Otuonye was not working.  She typically worked Fridays and Saturdays.

11

### ii. Parker Bolejack

When Parker Bolejack, a pharmacist at Walgreens,[9] heard the recording of Mr. Otuonye's voicemail to Dr. Henson requesting that he write unnecessary non-narcotic prescriptions, he was "astonished . . . just flabbergasted that that would be done as a normal practice." Jt. App., Vol. 8 at 1817-18. He testified, "If the patient doesn't have a need to be on medicine, why would you want the person to be on medicine[?] It looks as though you're just trying to get prescriptions to fill just so you can have more volume." *Id.* at 1818.

### iii. Carly Haynes

Carly Haynes, the Kansas Board of Pharmacy's Director of Compliance, prepared an expert report and testified as an expert witness. She reviewed K-TRACS, patient profiles, prescriptions, a doctor audit report the DEA prepared, text messages, and interviews with Neighborhood customers. She identified the following red flags:

1. At least once, a customer had a prescription filled at Neighborhood after Walgreens refused to fill it.

2. Mr. Otuonye filled controlled substance prescriptions for a husband and wife in identical strengths and quantities.

3. Large quantities of opioids were prescribed with higher than normal daily dosages and in "immediate release" formulations.

4. Neighborhood filled Dr. Henson's prescriptions for the same patients for both hydromorphone and methadone which, if both were taken as directed, would

---

[9] Mr. Bolejack worked at the Walgreens location in Bonner Springs, Kansas, and had been a pharmacist for nine years when he testified. He was one of the pharmacists who initially contacted the DEA with concerns about Dr. Henson's prescriptions.

equal 12 pills a day—"much, much higher than what is totally recommended at all." Jt. App., Vol. 10 at 2185.

5. Dr. Henson frequently prescribed hydromorphone and methadone in the highest allowable milligram amounts for a retail pharmacy.

6. There were several instances of duplicative treatment—i.e., the same patient being prescribed multiple drugs that treat the same condition.

7. Dr. Henson frequently prescribed over-the-counter medications for which prescriptions were unneeded.

8. Dr. Henson often provided prescriptions for controlled substances that did not list the patient's address, or that exhibited obvious discrepancies in the patient's address.

9. Many patients paid in cash for their opioids.

10. When Ms. Sabra refused to fill Dr. Henson's controlled substance prescriptions, Mr. Otuonye would fill them at a later date when he was on duty at Neighborhood.

Based on these findings, Ms. Haynes offered her expert opinion that Mr. Otuonye "should not have been filling the prescriptions for these quantities for these patients" and that doing so was "outside the course" of professional practice. Jt. App., Vol. 10 at 2217.

### iv. Dr. Val Brown, Jr. and Nurse Practitioner Mary Gonzalez

Dr. Val Brown, Jr. and Nurse Practitioner Mary Gonzalez, both prescribers who treat chronic pain, had patients fill prescriptions at Neighborhood Pharmacy at a similar 3:1 ratio as those of Dr. Henson. But Ms. Gonzalez testified that a request—either from a patient or a pharmacist—to write additional non-controlled prescriptions would be unusual. Dr. Brown testified he would find such a request "a little bit suspicious." Jt. App., Vol. 10 at 2251. Neither had ever received such a request from Mr. Otuonye, any

13

other pharmacist, or any patient, and both testified that they would not write such a prescription.

b. *Dr. Henson's patients*

The Government presented testimony from eight of Dr. Henson's patients about Dr. Henson's practices, their communications with Dr. Henson about Neighborhood and Mr. Otuonye, and their use of the controlled substances that Dr. Henson prescribed them. We summarize below some of the key testimony.

Patricia Lanier first came to Dr. Henson with legitimate chronic pain and was prescribed Percocet (oxycodone and acetaminophen) and Oxycontin (oxycodone).[10] When Ms. Lanier told Dr. Henson that pharmacies were rejecting his prescriptions, he referred her to Neighborhood.

Justice Embry also saw Dr. Henson for pain treatment. Dr. Henson prescribed oxycodone, alprazolam, and other medications, and he told her to fill her prescriptions at Neighborhood when she could not get them filled at Walgreens. At Neighborhood, with Ms. Embry present, Mr. Otuonye called Dr. Henson and asked him to prescribe three non-controlled substances. Mr. Otuonye incorrectly told her that her insurance would not pay for the oxycodone because it was a controlled substance, and she paid out of pocket.

Joshua Giesy testified that his friend, Cory Shock, introduced him to Dr. Henson, paid him to go to Dr. Henson's clinic, and paid Dr. Henson to write him prescriptions for

---

[10] Ms. Lanier was later prescribed methadone, at her request, because she was worried about the side effects of Percocet and Oxycontin.

14

opiates and Xanax (alprazolam). When Mr. Giesy could not fill the prescriptions at Walgreens, Mr. Shock told him to go to Neighborhood.

Grant Lubbers, an oxycodone addict who also sold pills on the street, was introduced to Dr. Henson by his supplier, Nick McGovern. When Mr. Lubbers had difficulty filling prescriptions, Dr. Henson told him to go to Neighborhood because "he had had a conversation with them and they would fill the prescriptions for us." Jt. App., Vol. 9 at 1875.

Eddie Montes was also introduced to Dr. Henson by Nick McGovern. He was prescribed controlled substances for pain and told to go to Neighborhood when Walgreens stopped filling his prescriptions. When he went to Neighborhood and was told about the 3:1 Policy, he called Dr. Henson, who called Neighborhood and prescribed three non-narcotic drugs.

Michael Osterman testified he began filling Dr. Henson's prescriptions for hydromorphone, methadone, and alprazolam at Neighborhood in October 2014—even though Neighborhood's prices were triple those of other pharmacies—because it was the only place he could get them filled.

c. *Special Agent Harshaw*

Finally, the Government presented testimony from Korby Harshaw, Assistant Special Agent in Charge for the U.S. Department of Health and Human Services, Office of Inspector General. Agent Harshaw testified that Neighborhood submitted 166 claims to Medicare for prescriptions written by Dr. Henson and received reimbursements

15

totaling over $17,000.  Neighborhood was also reimbursed about $4,927 for claims submitted to Medicaid for Dr. Henson's prescriptions.

In several instances, Neighborhood submitted claims for non-controlled prescriptions, but not controlled prescriptions dispensed to the same patient on the same day.  This suggested to Agent Harshaw that "someone was trying to hide the existence of the controlled substance prescription from the government health care programs." Jt. App, Vol. 9 at 1965.  Further, the fact that customers and a pharmacist rather than a doctor initiated the non-controlled prescriptions indicated to Agent Harshaw they were not medically necessary.

### C. *Procedural Background*

Mr. Otuonye was indicted on four counts:[11]

> Count 1 – conspiring to distribute Schedule II and Schedule IV prescription drugs, including opioids, outside the usual course of professional medical practice and without a legitimate medical purpose, in violation of 21 U.S.C. § 846.
>
> Count 2 – distributing Schedule II and Schedule IV prescription drugs, including opioids, outside the usual course of professional medical practice and without a legitimate medical purpose, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(c), and 18 U.S.C. § 2.
>
> Count 3 – defrauding Medicare in violation of 18 U.S.C. § 1347.
>
> Count 4 – defrauding Medicaid in violation of 18 U.S.C. § 1347.

---

[11] Dr. Henson was charged, tried, and convicted separately.

A jury convicted Mr. Otuonye of all four counts.  The district court sentenced him to 150 months of imprisonment on each of the first two counts, and 120 months on each of the other two counts, all to run concurrently.

## II. **DISCUSSION**

Mr. Otuonye raises seven issues on appeal.[12]  The first five are challenges to the admission of evidence.  He argues the district court abused its discretion by admitting (A) statements of Dr. Henson as a co-conspirator, (B) text messages from Dr. Henson's patients, (C) testimony about Dr. Henson's business practices and his patients' ultimate use of their prescriptions, (D) cumulative evidence, and (E) certain summary exhibits.  Mr. Otuonye also challenges (F) the sufficiency of the evidence on all four counts of conviction and (G) the district court's calculation of his sentencing guidelines range.  We affirm the district court on each issue.

### A.  *Admission of Co-Conspirator Statements*

Mr. Otuonye first argues the district court erred when it found Dr. Henson was his co-conspirator and Dr. Henson's out-of-court statements were thus outside the scope of the rule against admission of hearsay evidence.  Mr. Otuonye has failed to show that the co-conspirator factual finding was clear error.

---

[12] Mr. Otuonye identifies only six issues in his briefing on appeal.  His third evidentiary challenge, however, raises two separate but related legal issues.  We analyze each of those issues separately.

## 1. Standard of Review

"[W]hile the ultimate issue of the admission or exclusion of evidence is reviewed for an abuse of discretion, preliminary foundational determinations, such as whether statements offered under Rule 801(d)(2)(E) were made during the course of and in furtherance of a conspiracy, are factual findings, reviewed for clear error." *United States v. Alcorta*, 853 F.3d 1123, 1137-38 (10th Cir. 2017) (quotations omitted). "[A] finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (citations and quotations omitted). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it . . . ." *Id.* at 573-74.

## 2. Legal Background

Hearsay statements are generally inadmissible as evidence. Fed. R. Evid. 802. Fed. R. Evid. 801(d)(2)(E), however, provides that a statement is not hearsay if it "was made by the party's coconspirator during and in furtherance of the conspiracy." "Before admitting statements into evidence under the coconspirator exception to the hearsay rule, the district court must determine by a preponderance of the evidence that (1) a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, and

(3) the statements were made in the course of and in furtherance of the conspiracy."

*Alcorta*, 853 F.3d at 1137.[13]

"The preferred procedure of this circuit is to hold a *James* hearing outside the jury's presence to make preliminary findings as to whether these requirements are satisfied . . . ." *United States v. Stein*, 985 F.3d 1254, 1269 (10th Cir. 2021) (quotations omitted).[14]

"[I]n making a preliminary factual determination under Rule 801(d)(2)(E), [courts] may examine the hearsay statements sought to be admitted." *Bourjaily v. United States*, 483 U.S. 171, 181 (1987). There must also be "some independent evidence linking the defendant to the conspiracy"—that is, evidence other than the proffered co-conspirator statements themselves—but that evidence "need not be substantial." *Alcorta*, 853 F.3d at 1142 (quotations omitted).

### 3. Additional Procedural Background

The district court conducted a *James* hearing and found, by a preponderance of the evidence, that a conspiracy existed between Mr. Otuonye and Dr. Henson. With respect to knowledge, the court found "it's clear that . . . [it] at least was known to Mr. Otuonye

---

[13] "The elements of the offense of conspiracy are (1) an agreement with another person to violate the law; (2) knowledge of the essential objectives of the conspiracy; (3) knowing and voluntary involvement; and (4) interdependence among the alleged conspirators." *Alcorta*, 853 F.3d at 1136.

[14] A *James* hearing is an evidentiary hearing to establish the existence of a predicate conspiracy for purposes of Rule 801(d)(2)(E). It is named for the case where it originated, *United States v. James*, 590 F.2d 575 (5th Cir. 1979).

that his pharmacy was benefiting, Dr. Henson's medical practice was benefiting, and that was the essential objective of the conspiracy." Jt. App., Vol. 6 at 1151-52. The court found it was "obvious" that Mr. Otuonye "knowingly and voluntarily became a part of it." *Id.*

4. **Analysis**

Mr. Otuonye fails to show the district court clearly erred. He thus fails to show the district court abused its discretion in admitting Dr. Henson's statements made in furtherance of the conspiracy.

At the *James* hearing, the Government introduced (1) the 3:1 sign; (2) evidence that "the pharmacy's prescription[s] increased considerably once Henson began having prescriptions filled at the pharmacy;" and (3) a voicemail Mr. Otuonye left with Dr. Henson requesting that he write three unnecessary non-narcotic prescriptions to stay under the 3:1 ratio. Jt. App., Vol. 6 at 1154. The district court relied on each of these as "independent evidence" of the conspiracy. *Id.* The court's factual findings, taken together, support an overall finding that a conspiracy existed for purposes of Federal Rule of Evidence 801(d)(2)(E).

Mr. Otuonye argues that the Government failed to show a conspiracy existed because it submitted no evidence that Mr. Otuonye had knowledge of Dr. Henson's prescribing practices. The district court found otherwise based on ample evidence.

First, when other pharmacies rejected Dr. Henson's prescriptions, he referred his patients to Neighborhood. The number of Dr. Henson prescriptions filled at

20

Neighborhood substantially increased during the alleged conspiracy, and Dr. Henson was Neighborhood's top prescriber during that time.

Second, the evidence showed Mr. Otuonye and Dr. Henson communicated often during the alleged conspiracy. Although the content of most of these conversations does not appear in the record, Mr. Otuonye admits "[t]here was one voicemail from Otuonye to Dr. Henson indicating he needed three noncontrolled prescriptions before he could fill the controlled prescriptions." Aplt. Br. at 25. This voicemail is independent evidence that Mr. Otuonye entered into an agreement with Dr. Henson that involved prescribing and dispensing unnecessary non-controlled prescriptions to avoid suspicion.

Third, the 3:1 Policy suggests Mr. Otuonye tried to avoid scrutiny from his wholesaler and regulators by maintaining a certain ratio of non-controlled to controlled sales. And Mr. Otuonye's phone calls to Dr. Henson to request additional non-narcotic prescriptions further suggest an agreement to that end.

Based on this record, we cannot conclude the district court clearly erred in finding the existence of a conspiracy. We therefore reject Mr. Otuonye's challenge to the admission of Dr. Henson's statements made in furtherance of that conspiracy.

## B. *Confrontation Clause*

Mr. Otuonye argues 12 Government exhibits should have been excluded under the Sixth Amendment's Confrontation Clause. Each consists of informal text messages exchanged between Dr. Henson and his patients concerning opioid prescriptions and where to fill them. The Confrontation Clause provides, "In all criminal prosecutions, the

21

accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."
U.S. Const. amend. VI.

Mr. Otuonye has waived this issue by failing to raise a Confrontation Clause objection in the district court and failing to argue plain error on appeal. *United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019) ("When an appellant fails to preserve an issue and also fails to make a plain-error argument on appeal, we ordinarily deem the issue waived (rather than merely forfeited) and decline to review the issue at all—for plain error or otherwise.").

Mr. Otuonye argues the issue was preserved because he objected to the admission of one patient's text messages on the ground that she "is not going to be on the stand to have any kind of cross-examination." Jt. App., Vol. 6 at 1252. This was insufficient to preserve a Confrontation Clause objection. To preserve an objection for appeal, a party must "indicate to the district court the precise ground for [its] complaint." *United States v. Winder*, 557 F.3d 1129, 1136 (10th Cir. 2009) (quotations omitted). Although the Confrontation Clause protects a defendant's ability to cross examine witnesses, cross-examination also underlies the rule against hearsay. *See United States v. Gary*, 999 F.2d 474, 479 (10th Cir. 1993) ("Hearsay evidence is ordinarily inadmissible because the absence of an opportunity to cross examine the source of the hearsay information renders it unreliable." (quotations omitted)). Mr. Otuonye did not specify whether his objection was rooted in the Confrontation Clause or Federal Rule of Evidence 802.[15]

---

[15] Mr. Otuonye's counsel initially objected to admission of these text messages on the ground that the patients were not coconspirators and their statements "would be

Even if the issue was not waived, Mr. Otuonye's challenge would fail. The Confrontation Clause applies only to "testimonial hearsay," which typically involves "a solemn declaration or affirmation made for the purpose of . . . proving some fact." *Crawford v. Washington*, 541 U.S. 36, 51, 69 (2004) (quotations and alteration omitted). The text messages challenged here are not "testimonial statements." There is no indication that "a reasonable person in the position of the declarant would objectively foresee" that the text messages "might be used in the investigation or prosecution of a crime." *United States v. Keck*, 643 F.3d 789, 796 (10th Cir. 2011) (quotations omitted).[16] The admission of the challenged statements therefore did not implicate the Confrontation Clause.

## C. *End Use and Business Practices Testimony*

Mr. Otuonye argues the district court erred by admitting evidence concerning Dr. Henson's "business practices" and the "end use" of the prescriptions Mr. Otuonye filled for Dr. Henson's patients. Aplt. Br. at 33. He contends this evidence was irrelevant to the charged offenses and unduly prejudicial. We reject these arguments.

---

inadmissible hearsay." Jt. App., Vol. 6 at 1249. Only when asked by the court to further explain his objection did Mr. Otuonye's counsel mention cross-examination. *Id.* at 1252. The Confrontation Clause was not mentioned.

[16] We have declined to apply the Confrontation Clause, for example, to "jailhouse conversations between criminal codefendants (none of whom were cooperating with the government)" because their "primary purpose" was not to "creat[e] evidence for the prosecution." *Alcorta*, 853 F.3d at 1137.

1. **Standard of Review**

"[W]e review a district court's evidentiary decisions for abuse of discretion." *United States v. Griffin*, 389 F.3d 1100, 1103 (10th Cir. 2004). But even when we have determined that the district court abused its discretion by admitting certain evidence, "we still may not grant relief if the district court's error was harmless." *United States v. Washington*, 653 F.3d 1251, 1270 (10th Cir. 2011). "A non-constitutional error, such as a decision whether to admit or exclude evidence, is considered harmless unless a substantial right of a party is affected." *United States v. Chavez*, 976 F.3d 1178, 1204 (10th Cir. 2020) (quotations and alteration omitted).

2. **Analysis**

Relevant evidence is generally admissible. Fed. R. Evid. 402. It may be excluded, however, "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "The exclusion of relevant evidence under Rule 403 is an extraordinary remedy to be used sparingly." *K-B Trucking Co. v. Riss Int'l Corp.*, 763 F.2d 1148, 1155 (10th Cir. 1985) (quotations omitted). Trial judges are afforded "considerable discretion in performing the Rule 403 balancing test because district court judges have front-row seats during trial and extensive experience ruling on evidentiary issues." *United States v. Archuleta*, 737 F.3d 1287, 1292 (10th Cir. 2013) (quotations omitted).

a. *"End use" testimony*

At a motion in limine pretrial hearing, the Government advised the district court that some of the witnesses it intended to call would testify about what Dr. Henson's patients did with the pills he prescribed. The Government said this evidence would show "why [the patients] went to Henson and ultimately why they went to Neighborhood and agreed to get scripts that they didn't need. And the answer is because they needed the controlled substance scripts because that's how they made their living, and they also abused them." Jt. App., Vol. 6 at 1209. Mr. Otuonye's counsel objected that this "end-use" testimony was irrelevant and shed no light on whether Mr. Otuonye conspired with Dr. Henson. The district court concluded the evidence was relevant and admissible because "ultimately it unduly truncates the res gestae of the whole offense to clip the story off at that point . . . . I think the actual use the customers made of the prescriptions ultimately is a part of the story here." *Id.* at 1213-14.

Mr. Otuonye argues the district court should not have admitted this testimony because there was no evidence that he was aware of the patients' misuse of the prescriptions he filled. He also contends this evidence was "inflammatory and more prejudicial than probative." Aplt. Br. at 38 (citing Fed. R. Evid. 403). We disagree.

First, the evidence was relevant. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. Dr. Henson's patients' abusing or selling their prescriptions is probative of the fact that the prescriptions lacked a legitimate medical use, an element of the charge against Mr. Otuonye.

25

Second, the evidence was not unfairly prejudicial. "Evidence is unfairly prejudicial if it makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant *wholly apart* from its judgment as to his guilt or innocence of the crime charged." *United States v. Merritt*, 961 F.3d 1105, 1115 (10th Cir. 2020) (quotations omitted). The challenged evidence illustrated the foreseeable consequences of the crime charged against Mr. Otuonye.

Mr. Otuonye suggests this testimony misled the jury into believing that Mr. Otuonye himself knew of the patients' activities when he filled their prescriptions. But many of Dr. Henson's patients testified they did not tell Mr. Otuonye that they were addicts or that they intended to sell their prescribed opioids. And, as the district court observed, the defense was free to cross examine the witnesses as to Mr. Otuonye's knowledge of their activities. Any risk of prejudice resulting from the admission of this evidence was therefore minimal.

Finally, the error, if any, was harmless. *Chavez*, 976 F.3d at 1204. As we explain below, even without this testimony, the evidence was more than sufficient to convict Mr. Otuonye. "Where the wrongly admitted evidence was cumulative of other properly admitted evidence, it is less likely to have injuriously influenced the jury's verdict." *United States v. Clifton*, 406 F.3d 1173, 1179 (10th Cir. 2005) (quotations and alteration omitted).

26

b. *Dr. Henson's business practices*

Mr. Otuonye raises a similar challenge to the admission of evidence about Dr. Henson's "business practices." But Mr. Otuonye does not clearly define what he means by Dr. Henson's "business practices," nor does he precisely identify the testimony he believes should have been excluded. In his briefing, the only specific testimony he references is that of Grant Lubbers concerning his interactions with Dr. Henson. But Mr. Otuonye does not identify "the precise references in the record" where his objection to this testimony "was made and ruled on," as required by our circuit rules. 10th Cir. R. 28.1(B). And we have not identified any such objection in the record. Mr. Otuonye likely forfeited this issue in district court,[17] but even if he preserved it there, he has waived it through inadequate briefing on appeal. *See Burke v. Regalado*, 935 F.3d 960, 1014 (10th Cir. 2019) ("[A]n appellant may waive an issue by inadequately briefing it.").

D. ***Cumulative Evidence***

Mr. Otuonye argues he was prejudiced by the admission of cumulative evidence. "Cumulative evidence is defined as evidence which goes to prove what has already been established by other evidence." *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 829 (10th Cir. 1995) (quotations omitted). On whether to exclude evidence as cumulative, "[t]he trial judge's discretion is wide, because cumulative evidence is excluded in the

---

[17] At the *James* hearing, the district court sustained what it characterized as Mr. Otuonye's "prospective" objection to the admission of testimony about "[h]ow Dr. Henson managed his own practice." Jt. App., Vol. 6 at 1045-47. But it does not appear that Mr. Otuonye reprised this objection at trial.

interests of trial efficiency, time management, and jury comprehension." *Jewell v. Life Ins. Co. of N. Am.*, 508 F.3d 1303, 1314 (10th Cir. 2007).

Mr. Otuonye fails to show that (1) any cumulative evidence was admitted or (2) he was prejudiced by the admission of any such evidence. He discusses four instances in which he objected to the Government's planned witness testimony on the ground that it was cumulative.[18] *See* 10th Cir. R. 28.1(B). Specifically, he objected to the testimony of:

1. Dr. Henson's patients Kim Schusler, Ashley Schusler, and Michael Osterman on the ground that their testimony about Dr. Henson's business practices would be cumulative of other patients' testimony;

2. Carly Haynes and Alexandra Blasi from the Kansas Board of Pharmacy on the ground that it would be cumulative of earlier testimony about standards of practice for pharmacists;

3. Justice Embry, another Dr. Henson patient, on the ground that it would be cumulative of testimony from other patients about their experiences with Neighborhood Pharmacy and Dr. Henson; and

4. TFO Kyle Twaddle, including the presentation of summary exhibits, about text messages and prescriptions that had been previously introduced through other witnesses.

Mr. Otuonye fails to acknowledge that the district court sustained his objections to (1) and (3). In response to Mr. Otuonye's objection, the court limited the testimony of Kim Schusler, Ashley Schusler, and Michael Osterman. It allowed Kim Schusler to

_____

[18] Mr. Otuonye provides five additional record citations to support his contention that his "objection[s] to cumulative evidence were well preserved." Aplt. Br. at 41 (citing Jt. App., Vol. 10 at 2248-50; *id.* at 2280-81; *id.* at 2306; Jt. App., Vol. 5 at 950-51; Jt. App., Vol. 6 at 972-74). But he does not explain on appeal why any of the objected-to testimony was cumulative or make any argument why it should not have been admitted.

testify only "very narrowly" and Ashley Schusler and Michael Osterman to testify "with respect to Neighborhood but not really with respect to Dr. Henson" because "any additional testimony about how Dr. Henson performed is cumulative." Jt. App., Vol. 6 at 2105. Similarly, the court limited Justice Embry's testimony to new evidence that had not been presented by other witnesses—that when she went to Neighborhood for the first time, Mr. Otuonye falsely told her he could not run her insurance because she was getting controlled substances. Jt. App., Vol. 10 at 2237-38. It does not appear Mr. Otuonye made any further objections to the narrowed testimony actually presented by these witnesses. He has not provided us with a citation to the record where we might find their testimony—let alone any additional objections that he might have preserved for appeal. And he has made no attempt to demonstrate that any of these witnesses' testimony was cumulative of evidence already admitted.

Mr. Otuonye similarly fails to demonstrate the testimony of (2) Carly Haynes and Alexandra Blasi, or (4) TFO Kyle Twaddle was cumulative of any other evidence already admitted. He does not even provide a citation to the testimony of Ms. Haynes or Ms. Blasi. As to TFO Twaddle, Mr. Otuonye argues only that the witness was allowed to rely upon and testify about text messages and prescriptions that had already been admitted. He has failed to demonstrate that any of the objected-to testimony was a "total repeat" of earlier testimony. *Archuleta*, 737 F.3d at 1292. It is not enough to assert in general terms that evidence was cumulative because multiple witnesses provided similar testimony. *See United States v. Edwards*, 540 F.3d 1156, 1162-63 (10th Cir. 2008) (holding that recordings of five separate 911 calls reporting the same incident were not cumulative

29

evidence). The testimony presented by each of these witnesses was relevant to the crimes charged. Mr. Otuonye has failed to demonstrate that any prejudice he suffered outweighed the additional probative value of the evidence. *See* Fed. R. Civ. P. 403. We thus conclude that the district court did not abuse its discretion in admitting the challenged evidence.

### E. *Summary Exhibits*

Mr. Otuonye challenges the admission of certain summary exhibits. Although he objected at trial to some of them, he does not reprise those objections here. Instead, he raises new objections for the first time on appeal, and "arguments raised for the first time on appeal are waived." *Littler v. Budd Co.*, 955 F.3d 816, 821 (10th Cir. 2020) (citation omitted).

A party "forfeits a challenge on appeal by . . . stating a different ground at trial than on appeal." *United States v. Roach*, 896 F.3d 1185, 1192 (10th Cir. 2018) (citation omitted); *see also Leffler*, 942 F.3d at 1196 (forfeiture rules "apply not only when a litigant raises a new argument on appeal but also when a litigant changes to a new theory on appeal that falls under the same general category as an argument presented at trial" (quotations omitted)). Mr. Otuonye does not argue for plain error review, so the issue is waived. *Roach*, 896 F.3d at 1192.

### F. *Sufficiency of the Evidence*

Mr. Otuonye next challenges the sufficiency of the evidence for each of the four counts on which he was convicted. We reject his challenge.

## 1. Standard of Review

"We review de novo whether there was sufficient evidence to support a defendant's convictions, viewing all the evidence and any reasonable inferences drawn therefrom in the light most favorable to the government." *United States v. Wagner*, 951 F.3d 1232, 1255 (10th Cir. 2020) (quotations omitted). We consider both circumstantial and direct evidence, "but we do not weigh the evidence or consider the credibility of witnesses." *United States v. Isabella*, 918 F.3d 816, 830 (10th Cir. 2019). Reversal for insufficient evidence is proper "only when no reasonable jury could find the defendant guilty beyond a reasonable doubt." *Id*.

An insufficient evidence claim not raised or preserved below is reviewed for plain error, but "our review for plain error in this context differs little from our de novo review of a properly preserved sufficiency claim" because "a conviction in the absence of sufficient evidence will almost always satisfy all four plain-error requirements." *United States v. Gallegos*, 784 F.3d 1356, 1359 (10th Cir. 2015); *see also United States v. Duran*, 133 F.3d 1324, 1335 n.9 (10th Cir. 1998).[19]

## 2. Additional Procedural Background

Both parties rested at the conclusion of the Government's case in chief. Mr. Otuonye then moved for acquittal under Rule 29 of the Federal Rules of Criminal Procedure. He relied solely on inconsistencies regarding the date on which the "3:1" sign

---

[19] We include this plain error discussion to the extent Mr. Otuonye's insufficiency arguments vary from those he made below.

was posted at Neighborhood Pharmacy and the fact that the 3:1 ratio was not consistent with the 20 percent threshold that Mr. Otuonye and Dr. Henson had supposedly agreed to.[20] The district court denied that motion.

After the verdict, Mr. Otuonye moved for a judgment of acquittal on each count and for a new trial under Federal Rules of Criminal Procedure 29 and 33. He raised several arguments, but did not "specifically address any element of any count for which he believes the Government's evidence to be lacking." Jt. App., Vol. 3 at 605 (district court's memorandum and order). He generally argued that the Government's heavy reliance on the 3:1 Policy was misplaced. He also said the evidence showed the number of pills dispensed to Dr. Henson's patients decreased monthly which, he contended, was inconsistent with how individuals in the illegal drug trade typically operate. The district court rejected these arguments.

3. **Analysis**

a. *Count 1 - Conspiracy*

To prove a conspiracy in violation of 21 U.S.C. § 846, "[t]he government must prove beyond a reasonable doubt (1) an agreement with another person to violate the law, (2) knowledge of the essential objectives of the conspiracy, (3) knowing and voluntary involvement, and (4) interdependence among the alleged conspirators." *United States v. Dozal*, 173 F.3d 787, 797 (10th Cir.1999) (quotations omitted).

---

[20] Mr. Otuonye moved for acquittal on all counts but focused his arguments on the conspiracy count.

32

Mr. Otuonye challenges the knowledge element of the conspiracy offense, arguing that the evidence was insufficient to show he knew any of Dr. Henson's prescriptions were illegitimate. We disagree. The evidence at trial was sufficient for a reasonable jury to determine beyond a reasonable doubt Mr. Otuonye knew Dr. Henson's prescriptions were not issued for legitimate medical reasons.

Mr. Otuonye and Dr. Henson first met in October 2014. The evidence at trial showed that, starting around that time, Dr. Henson regularly referred his patients to Neighborhood Pharmacy—specifically mentioning Mr. Otuonye—when they had trouble filling their prescriptions at other pharmacies. After October 2014, Mr. Otuonye began filling an increasing number of controlled substance prescriptions for Dr. Henson's patients. DI O'Malley testified that Neighborhood's revenues increased substantially during this period, in part because of increased volume and in part because of the high prices that Mr. Otuonye charged Dr. Henson's customers.

The Government also presented evidence of "red flags" that should have alerted Mr. Otuonye that Dr. Henson was prescribing controlled substances outside the usual course of professional medical practice and without a legitimate medical purpose. These included:

- The quantities of drugs prescribed;
- The types and combinations of drugs prescribed;
- Dr. Henson's patients often paid in cash;
- Dr. Henson's patients often drove long distances to Neighborhood.

33

Two pharmacists, including an expert witness from the Kansas Board of Pharmacy, testified these "red flags" should have alerted Mr. Otuonye that the prescriptions were illegitimate. Even Mr. Otuonye's own employees—his relief pharmacist, Ms. Sabra, and his pharmacy technician, Colleen Pauly—testified they had concerns about Dr. Henson's prescriptions. Ms. Sabra said she raised those concerns with Mr. Otuonye and eventually refused to fill controlled substance prescriptions written by Dr. Henson.

The 3:1 Policy provided further circumstantial evidence that Mr. Otuonye was aware Dr. Henson's prescriptions were illegitimate.[21] The Government presented testimony that PBA, Neighborhood's wholesaler, had previously flagged Neighborhood because more than 20 percent of its purchases were for controlled substances. Mr. Otuonye therefore knew about the 20 percent threshold. A notecard found at Dr. Henson's home suggests that he was aware of it as well. *See* Jt. App., Vol. 12A at 2553 (notecard reading "NEIGHBORHOOD PHARMACY – 20%"). Mr. Otuonye also repeatedly called Dr. Henson to ask him to prescribe unnecessary non-narcotic medications to stay under this threshold. The Government presented testimony from other pharmacists and prescribers that this practice was unusual and outside the usual course of professional practice. Also, Mr. Otuonye's seeking unnecessary non-narcotic

---

[21] Indeed, he admitted to DI O'Malley that the "optics" of his dispensing practices "looked bad." Jt. App., Vol. 5 at 916.

prescriptions undermines his argument that the 3:1 Policy was implemented to minimize the overall number of narcotic prescriptions filled by Neighborhood.

Mr. Otuonye argues the 3:1 Policy does not establish he conspired with Dr. Henson, in part because the 3:1 Policy was not limited to Dr. Henson and because it both pre-dated and post-dated the period of the alleged conspiracy. But the Government did not rely solely or even primarily on the 3:1 Policy. "Rather than examining the evidence in bits and pieces, we evaluate the sufficiency of the evidence by considering the collective inferences to be drawn from the evidence as a whole." *United States v. Nelson*, 383 F.3d 1227, 1229 (10th Cir. 2004) (quotations omitted).

Nor does Mr. Otuonye's argument that pharmacies other than Neighborhood also filled Dr. Henson's prescriptions alter our conclusion. The evidence at trial did not indicate that any other pharmacy had regular contact with Dr. Henson, experienced a sudden uptick in patients and revenue, had a 3:1 Policy, or charged the same high prices as Neighborhood. We must review the evidence "in its entirety and in the light most favorable to the Government." *United States v. MacKay*, 715 F.3d 807, 827 (10th Cir. 2013).

b. *Count 2 - Distribution*

The jury was instructed that to find Mr. Otuonye guilty on Count 2, it had to find beyond a reasonable doubt that (1) Mr. Otuonye "distributed or dispensed" controlled substances, (2) "knowingly and intentionally," and (3) did so "outside the usual course of professional practice and without a legitimate medical purpose." Jt. App., Vol. 2 at 411 (jury instructions). The jury was further instructed that Mr. Otuonye could be convicted

35

as either a principal or an aider and abettor, and that it could find he acted knowingly whether he had actual knowledge or was deliberately blind. *See United States v. Soussi*, 316 F.3d 1095, 1106 (10th Cir. 2002) ("The district court should only give a deliberate ignorance jury instruction when the prosecution presents evidence that the Defendant purposely contrived to avoid learning all the facts in order to have a defense in the event of a subsequent prosecution." (quotations omitted)). "To establish a defendant's deliberate ignorance, the Government is entitled to rely on circumstantial evidence and the benefit of the favorable inferences to be drawn therefrom. Such evidence and its inferences must establish that a defendant had *subjective* knowledge of his criminal behavior." *United States v. Delreal-Ordones*, 213 F.3d 1263, 1268 (10th Cir. 2000) (citation and quotations omitted).

Again, Mr. Otuonye focuses his sufficiency of the evidence arguments on the knowledge element of the offense. We affirm Mr. Otuonye's conviction on this count for many of the same reasons as Count 1.

In particular, the evidence was sufficient for a reasonable jury to conclude that Mr. Otuonye was willfully blind to the criminality of his behavior. The Government presented testimony from multiple pharmacists that the dosages, pill quantities, and dangerous drug combinations that Dr. Henson prescribed should have alerted Mr. Otuonye that the prescriptions did not have a legitimate medical purpose and were prescribed outside the usual course of professional medical practice. The Government did not need to prove Mr. Otuonye was specifically told the prescriptions were illegitimate to satisfy its burden on the knowledge element of the offense. "[K]nowledge

36

must almost always be proved[] by circumstantial evidence." *United States v. Santos*, 553 U.S. 507, 521 (2008) (opinion of Scalia, J.).

Mr. Otuonye also failed to assure himself of the legitimacy of Dr. Henson's prescriptions. He told DI O'Malley he called Dr. Henson to ensure that the prescriptions were not forgeries. But the only other evidence concerning the content of Mr. Otuonye's communications with Dr. Henson shows that Mr. Otuonye specifically asked Dr. Henson to write unnecessary prescriptions to help mask the quantities of controlled narcotics he was filling.

Mr. Otuonye also had access to K-TRACS and could have used it to check the prescription history of Dr. Henson's patients. He rarely did, even though his own relief pharmacist, Ms. Sabra, recognized these red flags and raised her concerns with Mr. Otuonye. Although he was not legally required to check K-TRACS before filling any prescriptions, his failure to do so is further circumstantial evidence of his willful blindness.

   c. *Counts 3 and 4 - Health care fraud*

To convict Mr. Otuonye of defrauding Medicare and Medicaid in violation of 18 U.S.C. § 1347 under Counts 3 and 4, the jury had to find beyond a reasonable doubt that Mr. Otuonye "(1) devised a scheme or artifice to defraud a health care benefit program in connection with the delivery of or payment for health care benefits, items, or services; (2) executed or attempted to execute this scheme or artifice to defraud; (3) acted knowingly and willfully with the intent to defraud; and (4) the scheme to defraud employed false pretenses, representations, or promises." *United States v. Rufai*, 732 F.3d

37

1175, 1189–90 (10th Cir. 2013) (citations and quotations omitted). Medicaid and Medicare are both "health care benefit programs." *United States v. Redcorn*, 528 F.3d 727, 734 (10th Cir. 2008) (citing 18 U.S.C. § 24(b)).

Mr. Otuonye's challenge rests on the same arguments we have already rejected regarding his knowledge. The evidence sufficiently established Mr. Otuonye either knew or deliberately blinded himself to the fact that Dr. Henson's prescriptions were issued illegitimately. Prescriptions that are issued without a legitimate medical purpose are not valid prescriptions, *see Lovern*, 590 F.3d at 1099, and submitting them for reimbursement to Medicare and Medicaid—both "health care benefit programs"—constitutes a false representation. The evidence at trial showed Mr. Otuonye submitted 166 claims to Medicare for prescriptions written by Dr. Henson and that he received reimbursements totaling over $17,000.[22] He was reimbursed $4,927 for claims submitted to Medicaid for Dr. Henson's prescriptions. He therefore knowingly defrauded Medicaid and Medicare "in connection with the delivery of or payment for health care benefits." *Rufai*, 732 F.3d at 1189 (quotations omitted).

\* \* \* \*

---

[22] Mr. Otuonye notes that "[t]he Government never even attempted to parse out what prescriptions lacked a medical purpose. Based on the evidence, it would be impossible to determine which pills sent to insurance were issued for a valid medical purpose." Aplt. Br. at 52. But neither the quantity nor the amount of reimbursement is an element of the offense for Counts 3 and 4, *see Rufai*, 732 F.3d at 1189–90, and Mr. Otuonye does not contest that at least some of the prescriptions he filled for Dr. Henson's patients lacked a legitimate medical purpose.

Because the evidence was sufficient, we affirm Mr. Otuonye's convictions on each of the four counts against him.

## G. *Sentencing*

Mr. Otuonye argues the district court "failed to correctly calculate the sentencing guideline range" because it "assumed all Dr. Henson prescriptions lacked a medical purpose despite trial testimony to the contrary." Aplt. Br. at 59. This argument has been waived.

Although Mr. Otuonye raised this issue in his objections to the presentence investigation report and at the sentencing hearing, the district court did not rule on it. Rule 32 of the Federal Rules of Criminal Procedure provides that, at sentencing, the district court "must—for any disputed portion of the presentence report or other controverted matter—rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B). Mr. Otuonye did not object on Rule 32(i)(3)(B) grounds to the district court's failure to rule. This forfeits the issue. *See United States v. Fisher*, 805 F.3d 982, 992 (10th Cir. 2015); *United States v. Warren*, 737 F.3d 1278, 1285 (10th Cir. 2013); *United States v. Williamson*, 53 F.3d 1500, 1527 (10th Cir. 1995). And he does not argue for plain error on appeal, so the issue is waived. *Leffler*, 942 F.3d at 1196. Mr. Otuonye's counsel further conceded the issue at oral argument. Oral Arg. at 12:20-13:10.

39

## III.  **CONCLUSION**

We affirm Mr. Otuonye's convictions on each of the four counts against him, and his sentence.